# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 09-2218

———————

Noel Malonga,

        Petitioner,

    v.

Eric H. Holder, Jr., Attorney General
of the United States,

        Respondent.

\*    Petition for Review from the
Board of Immigration Appeals.

———————

Submitted: January 14, 2010
Filed: September 14, 2010

———————

Before MELLOY, SMITH, and COLLOTON, Circuit Judges.

———————

MELLOY, Circuit Judge.

Noel Malonga, a native and citizen of the Republic of the Congo ("the Congo"), petitions for review of an order of the Board of Immigration Appeals ("BIA") denying withholding of removal. He claims past persecution and a clear probability of persecution upon return on account of his ethnicity and political opinion. We grant the petition for review and remand for reconsideration of whether he faces a clear probability of persecution based on political opinion.

I.

A. Factual Background

In Malonga v. Mukasey, 546 F.3d 546 (8th Cir. 2008) ("Malonga I"), we described the basic facts of this case. We now revisit the factual background, first summarizing the relevant documentary evidence concerning the various regimes and conflicts in the Congo and then recounting the basis of Malonga's claim.

1. Situation in the Congo

The record paints the Congo as a country dominated by a series of totalitarian regimes punctuated, particularly in recent years, by violent conflict. In 1968, Marien Ngouabi led a military coup and held the presidency until his assassination in 1977. In 1979, Denis Sassou-Nguesso became president, which according to State Department reports, launched two decades of turbulent, single-party politics "bolstered by Marxist-Leninist rhetoric." Sassou-Nguesso is a northerner of Mbochi ethnicity.

In the 1990s, the country ostensibly transitioned to a multiparty democracy, but political stability remained elusive. Numerous opposition political parties were formed at the time, including the Mouvement Congolaise pour la Démocratie et le Dévélopment Intégral (Congolese Mouvement for Democracy and Integral Development, hereinafter "MCDDI"). In 1992, southerner Pascal Lissouba was elected president. Violent civil unrest subsequently broke out in June and November 1993 over the results of hotly disputed legislative elections. Risk of large-scale insurrection subsided after the parties accepted the decision of an international board of arbiters in February 1994. Lissouba attempted to eliminate Sassou-Nguesso's political-military faction as the country headed for a new round of elections in 1997,

-2-

igniting four months of civil war. Sassou-Nguesso eventually seized the presidency, toppling the Lissouba government.

Fighting between forces loyal to Sassou-Nguesso and several southern rebel groups engulfed the country in 1998. The rebel militias included the Cocoyes, who supported Lissouba, and the Ninjas, who are of mostly Lari ethnicity and were affiliated with Bernard Kolelas,[1] the founder of the MCDDI. The conflicts were largely concentrated in the south, including the Pool region surrounding the capital of Brazzaville.

Civilians found themselves caught in the crossfire, subjected to both indiscriminate violence and instances of deliberate brutality by all factions. Undisciplined troops and security forces associated with the government reportedly detained, beat, raped, "disappeared," and killed civilians, arbitrarily searched homes, and engaged in widespread looting. Government allied-forces were also known to single out individuals, mostly southern men, for arrest and even death on suspicion that they supported the Ninjas or the Cocoyes. The record paints the rebels as little better. Militias, particularly the Ninjas and other groups based in the southern Pool region, executed civilians thought to back the government based on their ethnicity. The militias of the Lari ethnic group reportedly looted property, raped women, and killed civilians, even members of their own ethnicity. In all, the war left nearly a third of the population displaced and thousands dead.

The Sassou-Nguesso government signed a cease fire with most rebel groups in late 1999, leading to a measure of calm. For example, the State Department observed in its 2001 country conditions report that it had received no accounts of government violence toward southern ethnic groups in the previous year and that politically

---

[1]Kolelas served as Prime Minister for the final months of the Lissouba regime.

motivated disappearances and killings also ceased. Lissouba and Kolelas themselves were effectively forced into exile and tried in absentia for war crimes.

State Department country conditions reports and other articles in the record acknowledge the 1997–1999 conflicts exhibited ethnic overtones, and other courts have recognized many of the recent conflicts to be ethno-political in nature. See Passi v. Mukasey, 535 F.3d 98, 102–03 (2d Cir. 2008) (noting, for example, that Brazzaville and the Pool region exhibited what appeared to be some of the most severe ethnic and political violence); Mapouya v. Gonzales, 487 F.3d 396, 402 (6th Cir. 2007) ("Strong ethnic overtones are present in Congolese politics, and the 1997-1998 civil war was no different."). Documentary evidence suggests that political and the most significant inter-ethnic tension has split roughly along geographical lines, pitting northerners against the more prosperous southerners. State Department reports, however, also caution against oversimplifying the unrest, and politics more generally, as north versus south. Each leader—Sassou-Nugesso, Lissouba, and Kolelas—has drawn heavy support from his own ethnic group in his immediate entourage. Nevertheless, the reports advise that the correspondence between "ethnic-regional and political cleavages" was inexact and only approximate, and that actual support of the current and recent governments "included persons from a broad range of ethnic and regional backgrounds."

In 2002, the latest year represented in the record, media reports documented renewed conflict in southern Congo between government forces and the Ninjas following Sassou-Nguesso's reelection. The Ninjas attacked government military posts in the Pool region, allegedly responding to government plots to arrest the militia's leader. Civilians were once again swept up in the fighting and suffered abuses by both sides, though particularly by the government, including killings, rapes, abductions, looting, and other destruction of property.

2.  Malonga's claims

Malonga is a native of the southern Pool region, and is of Lari ethnicity, a sub-group of the larger Kongo tribe.  The Kongo account for approximately forty-eight percent of the country's population and constitute the main tribal group in the south. The Lari group can be identified by accent, dialect, and surname and are concentrated geographically in the Pool region.

Malonga is or has been a member of several political groups and parties.[2] Although several of Malonga's affiliations coincide with his ethnic-regional roots, the record also suggests a broader, pro-democracy motivation behind his nearly four decades of opposition to the regimes of three different presidents.

In 1971, at age fourteen, Malonga participated in a demonstration against the Ngouabi regime.  According to Malonga, Sassou-Nguesso, who was then the chief-of-staff of the armed forces, sent the military to disperse the protest.  Soldiers beat Malonga as they broke up the demonstration and he suffered injuries that required hospital treatment and left scars on his legs and back.  In 1974, Malonga joined in a second demonstration but escaped unharmed when the military again responded violently.

The next incident occurred in 1977, when Malonga claims police broke up an anti-Ngouabi political meeting he had attended.  He was detained for forty-eight hours

---

[2]According to an affidavit Malonga submitted in support of his application, his political affiliations include:  the General Union of Congolese School Children and Students from 1971 to 1974; the Union de la Jeunesse Socialist Congolaise from 1974 to 1990; the Congolese Syndicate Confederation  from 1986 onward; MCDDI from 1991 onward; the Mbongui, a political association for expatriate Congolese, from 1996 onward; and the Collective of Congolese Scholars Native from the Pool, a political organization based in France uniting scholars from the Pool region, which he joined while residing in the United States.

without food or water and was beaten, which caused him to bleed from his mouth. Malonga claims to have been released by a police inspector who knew his father. Malonga also claims to have suffered severe headaches afterward, for which he sought treatment in 1982 and 1983.

Following graduation from university in 1985, Malonga went to work for the government, which by then was headed by Sassou-Nguesso. He testified a government job was his only option as a degree holder. He apparently retained a government post through the transition to the Lissouba regime until his departure in 1993.

In 1990, while a director of a state-run farm, Malonga ordered his employees to strike as part of a larger nation-wide strike against the Sassou-Nguesso government. Malonga alleges that he was immediately demoted as punishment, transferred back to Brazzaville, and forced to sit at a desk with nothing to do.

Politics liberalized not long after, and Malonga joined and became active in the MCDDI party. When the democratically-elected Lissouba government proved repressive, Malonga took-part in an anti-government demonstration organized by the MCDDI and other opposition groups in June 1993. Soldiers dispersed the protest with gunfire, killing four people. Malonga suffered some bruising in the resulting rush but was not seriously injured. He maintains Lissouba's forces came looking for him later that night, prompting him to run from his home in the Diata district of Brazzaville, which he states was a stronghold of Lissouba supporters. When the soldiers could not find him, they marked his house with an "X," allegedly indicating that it should be destroyed. They also wrote "we will have your skin," which Malonga interpreted as a death threat. Malonga subsequently experienced death threats from Lissouba supporters at work.

Malonga had received a scholarship to continue his education in the United States the year before and was preparing to depart around this time. A superior of a northern ethnicity refused to sign his departure papers, referring to the Kongo and the MCDDI as "troublemakers" and telling Malonga, "You have to stay here in the country to face the consequences of what you are doing." Malonga claims his departure was delayed until he was able to obtain permission from a member of his own tribe and who came from the same geographical region, outside the authorized channels. He entered the United States as an exchange visitor in August 1993. He completed his masters degree in 1999.

Sometime in 1994, after Malonga's arrival in the United States, his house in Brazzaville was destroyed and his possessions were looted. As described above, civil conflict stemming from disputed elections had broken out in recent months. Malonga claims Lissouba's supporters targeted his home as well as the homes of other Pool natives.

Malonga subsequently lost contact with his family during the conflicts of the mid to late1990s. He testified that his wife and child disappeared in 1996 and that he believes his parents are dead. Specifically, Malonga testified that his father was shot in 1999, and a letter from his brother confirms their father died in Brazzaville in early 2000. He also believes his family was targeted because of ethnicity or because of his political activities.

Malonga testified that he fears returning to the Congo because he believes he would be arrested and potentially executed by the government. He avers that the Kongo have suffered and continue to face persecution, particularly at the hands of Sassou-Nguesso and the current government. He also believes he would be a target because of his political affiliations and activities and has stated that he would continue to press for democracy if returned.

B. Procedural Background

In September 2007, the BIA affirmed the Immigration Judge's ("IJ") decision denying Malonga's 2001 petition for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Malonga petitioned this court for review. In Malonga I, we denied the petition in part and granted it in part. We held that we lacked jurisdiction to review the IJ's determination that Malonga's asylum application was untimely filed. 546 F.3d at 551, 556. We also denied the petition as to CAT relief because the record did not compel a conclusion contrary to the agency's. Id. at 555.

We granted the petition and vacated the BIA's decision as to withholding of removal. First, we held that the IJ had applied an incorrect legal standard in defining past persecution and remanded for findings under the appropriate standard. Id. at 552–53. Second, we addressed the IJ's finding that the Lari ethnic group of the larger Kongo tribe was not a particular social group because the Kongo constitute a substantial minority of the population. Id. at 553–54. Applying the standard adopted by the BIA in In re Acosta, 19 I. & N. Dec. 211 (BIA 1985), and In re C-A-, 23 I. & N. Dec. 951 (BIA 2006), we held that the Lari group of the Kongo tribe could constitute a particular social group. Malonga I, 546 F.3d at 554.

On remand for the withholding-of-removal claim, the BIA dismissed the appeal. It observed that the size of the Kongo tribe was important to its consideration of his claim. It further noted that Malonga had mainly testified that his problems were due to his political involvement and the region where he was from, where the Lari were located. It also stated that he had largely failed to differentiate between problems he suffered because of his political activities and those due to his ethnicity. Consequently, the BIA determined that Malonga's politics appeared intertwined with his ethnic identity. As discussed further below, the BIA implicitly assumed that

-8-

Malonga was credible,[3] but concluded nonetheless that he did not suffer past persecution. Specifically, it found that the mistreatment he suffered did not rise to the level of persecution and, alternatively, that most incidents, particularly those in the 1990s, did not occur on account of a protected ground. The BIA also held that he did not establish a clear probability of future persecution.

## II.

We review the BIA's decision as the final agency action. See Kebede v Gonzales, 481 F.3d 562, 564 (8th Cir. 2007) (per curiam). However, to the extent the BIA adopted the reasoning of the IJ, we will consider both the BIA's and IJ's opinions. See Rafiyev v. Mukasey, 536 F.3d 853, 856 (8th Cir. 2008). We evaluate questions of law *de novo* and afford substantial deference to the BIA's interpretation of immigration law and regulations. Cherichel v. Holder, 591 F.3d 1002, 1010 (8th Cir. 2010). We consider administrative findings of fact under the deferential substantial-evidence standard. Miah v. Mukasey, 519 F.3d 784, 787 (8th Cir. 2008). "We will not overturn an agency's decision unless [the petitioner] demonstrates that the evidence not only supports a contrary conclusion, but *compels* it." Bracic v. Holder, 603 F.3d 1027, 1034 (8th Cir. 2010) (quotation omitted).

The Attorney General must grant withholding of removal if Malonga proves his "life or freedom would be threatened" in the Congo on account of one of five protected grounds, including political opinion or social group. 8 U.S.C. §1231(b)(3)(A); Beck v. Mukasey, 527 F.3d 737, 739 (8th Cir. 2008). If Malonga establishes that he suffered past persecution on account of a protected ground, he is entitled to a rebuttable presumption of future persecution. 8 C.F.R. § 1208.16(b)(1)(i); Beck, 527 F.3d at 739. Without a showing of past persecution, Malonga must independently demonstrate a "clear probability" of future persecution

---

[3]As noted in Malonga I, the IJ did not make an explicit credibility finding.

to obtain withholding of removal.  <u>Beck</u>, 527 F.3d at 739.  The clear-probability standard is more onerous than the well-founded-fear standard of asylum.  <u>Ladyha v. Holder</u>, 588 F.3d 574, 579 (8th Cir. 2009).  In the absence of a statutory definition for persecution, we have held that it is an "extreme concept" that involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of a protected characteristic.  <u>Sholla v. Gonzales</u>, 492 F.3d 946, 951 (8th Cir. 2007).

## A.  Past Persecution

Malonga first argues that the BIA failed to consider all incidents of past mistreatment.  It is well established that the BIA need not list "every possible positive and negative factor in its decision" and has "no duty to write an exegesis on every contention." <u>E.g.</u>, <u>Averianova v. Holder</u>, 592 F.3d 931, 936 (8th Cir. 2010) (quotation omitted).  The agency is only required to "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." <u>Barragan-Verduzco v. I.N.S.</u>, 777 F.2d 424, 426 (8th Cir. 1985) (quotation omitted).  The BIA did not identify or discuss all individual events, including Malonga's demotion, the threat "we will have your skin," and the purported death threats at work.  We nonetheless conclude that it recognized and considered the breadth of Malonga's claim.  The opinion's recitation of facts suggests that the BIA generally understood that the claim comprised both threats as well as actual harm to Malonga, his belongings, and his relatives.  <u>Cf.</u> <u>Ngengwe v. Mukasey</u>, 543 F.3d 1029, 1036–37 (8th Cir. 2008) (remanding for further analysis where the agency did not fully consider the non-physical actions of the petitioner's alleged persecutors).  The BIA also stated that it considered Malonga's "problems" in the Congo "in the aggregate," suggesting that the BIA reflected upon more than the specific examples it called out in its analysis and indicating it reviewed the cumulative effect of the mistreatment.  <u>See</u> <u>Barrangan-Verduzco</u>, 777 F.2d at 426 (affirming the denial of relief in part where the opinion showed the agency considered the petitioner's contentions cumulatively).

Malonga next asserts that the record compels the conclusion that he endured past persecution. Upon careful consideration of the record, we disagree. Taken as a whole, we cannot say the record shows more than periodic instances of mistreatment that do not rise to the level of persecution and other incidents that cannot be clearly connected to a protected ground.

The BIA specifically held that the beatings and detention in the 1970s did not rise to the level of persecution, and we cannot say the record conclusively establishes the contrary. Limited detentions, even lasting two or three days, do not typically amount to persecution. See Eusebio v. Ashcroft, 361 F.3d 1088, 1091 (8th Cir. 2004). Although the beatings and injuries Malonga suffered are not insignificant, the presence of physical harm does not require a finding of past persecution. Tawm v. Ashcroft, 363 F.3d 740, 743 (8th Cir. 2004). "It is also important to consider whether an act of violence is an isolated occurrence, or part of a continuing effort to persecute on the basis of a factor enumerated in the statute. Generally speaking, evidence of isolated violence does not compel a finding of persecution." Ngure v. Ashcroft, 367 F.3d 975, 990 (8th Cir. 2004). Here, each instance of physical abuse was relatively isolated, occurring immediately after Malonga's participation in political demonstrations, and both occurred more than a decade before the next instance of mistreatment. Therefore, these incidents do not reflect an ongoing effort to seek out Malonga out for harm on account of a protected ground. Equally as important, Malonga remained in the Congo for sixteen years following the last incident, without further physical abuse or injury and with the ability to pursue an education and a career with relatively little interference for a number of years. These factors cut against a finding of persecution. See Quomsieh v. Gonzales, 479 F.3d 602, 606 (8th Cir. 2007) (holding no past persecution where the petitioner endured a four-hour detention and beating that resulted in cracked knee joint but remained in the country thirteen more years without similar incident); Kondakova v. Ashcroft, 383 F.3d 794, 797 (8th Cir. 2004) (observing the fact that petitioner remained in the country for a

year and finished her education following alleged kidnapping of her daughter weighed against a finding of past persecution).

We conclude the remaining mistreatment Malonga endured before leaving the Congo is also insufficiently severe, either alone or in combination, to compel a finding of persecution. Malonga does not allege that the 1990 demotion prevented him from earning a living or even caused economic hardship to support a conclusion of economic persecution. See Makatengkeng v. Gonzales, 495 F.3d 876, 882–83 (8th Cir. 2007) (discussing economic persecution). Further, his forced idleness at work, while likely demoralizing, does not amount to mental or emotional persecution, as he argues. See Shoaira v. Aschcroft, 377 F.3d 837, 844 (8th Cir. 2004) (considering psychological damage as persecution).

Likewise, the threats Malonga experienced following the 1993 demonstration do not require a finding of past persecution. Assuming the warning "we will have your skin" is properly considered a threat of death, threats that are "exaggerated, non-specific, or lacking in immediacy," as this was, do not support a finding of persecution. Corado v. Ashcroft, 384 F.3d 945, 947–48 (8th Cir. 2004) (holding that a single "specific, credible, and immediate" death threat on account of political opinion could constitute persecution); see also Ladyha, 588 F.3d at 577–78 (holding no past persecution despite the fact that assailants threatened petitioner at knifepoint and stated they would show him who was "king of the city"). Furthermore, Malonga has failed to point to any detail concerning the death threats at work, and such vague descriptions are insufficient to necessitate reversal. Notably, despite the various threats and his superior's hostility toward his ethnic and political groups, Malonga was able to leave the country not long after with the government's knowledge. He has also not alleged that any of these threats caused him to flee the Congo; rather, he arrived in the United States, more or less as scheduled, to complete a pre-arranged course of study. These considerations weigh against a finding of persecution. See Alanwoko v. Mukasey, 538 F.3d 908, 912–13 (8th Cir. 2008) (observing that

-12-

petitioner was not fleeing persecution on arrival in the United States, which contributed to a finding of no past persecution).

Finally, the record does not compel the conclusion that the events occurring after Malonga left the Congo were on account of a protected ground. It is well established that "[h]arm arising from general conditions such as anarchy, civil war, or mob violence will not ordinarily support a claim of persecution." Mohamed v. Ashcroft, 396 F.3d 999, 1003 (8th Cir. 2005). To warrant relief, the applicant bears the burden of providing some evidence that the persecutors were motivated to harm him, at least in part, on account of a protected ground. Id. at 1003–04; see also Hassan v. Ashcroft, 388 F.3d 661, 666 (8th Cir. 2004). Therefore, "the harm suffered must be particularized to the individual rather than suffered by the entire population." Mohamed, 396 F.3d at 1003. The fact that the mistreatment occurred during conflicts that can be broadly categorized as political or ethnic in nature does not establish the requisite particularized persecution. See id. at 1002–03; see also Quomsieh, 479 F.3d at 606; Feleke v. I.N.S., 118 F.3d 594, 598 (8th Cir. 1997).

Regarding the destruction of his home during the 1994 unrest, Malonga points to his assertions that Lissouba's supporters targeted his home and the homes of other Pool natives and to a statement in his mother's letter that Lissouba's forces came looking for him after he left. This evidence not so compelling as to disturb the BIA's finding. See, e.g., Mohamed, 396 F.3d at 1004 (observing the only evidence that the petitioner was persecuted on account of clan membership was the petitioner's testimony, when attack occurred at height of civil war, country reports indicated endemic banditry, and the petitioner testified that alleged persecutors attacked anyone in neighborhood thought to have money and valuables); Quomsieh, 479 F.3d at 602; Tan v. Attn'y Gen., 221 F. App'x 168, 171–72 (3d Cir. 2007) (unpublished) (petitioner's unsupported claim that mistreatment was on account of a protected ground did not compel a conclusion contrary to the IJ's finding that incidents were

-13-

common crimes); Ombongi v. Gonzales, 417 F.3d 823, 826 (8th Cir. 2005) (recognizing that some property damage is necessarily collateral to widespread ethnic conflicts). Rather, we conclude that several factors support the agency's conclusion. First, only an attenuated temporal connection exists between this event and his most recent political activities; a minimum of several months passed between his participation in the 1993 demonstration, the marking of his home for destruction and the alleged threats, and the actual demolition of his home. Second, Malonga was not in the country during this period and the letters from family or friends relating the incident years later do not attribute the attack to Lissouba's forces specifically or state that forces singled out his home or those of others like him in terms of politics or ethnicity. Although, as noted above, his mother states Lissouba's forces were looking for him at one time, a close read of the record indicates this was after his home had been destroyed. Third, some of these letters also indicate the district where his home was located was hard hit in general and Malonga has acknowledged that whole areas of Brazzaville were destroyed during the unrest. The record contains little other objective description of the 1994 conflicts, and none that supports Malonga's claims as to who destroyed his home and why.

Nor can we clearly connect the disappearances and deaths of Malonga's family members during the conflicts of the late 1990s to a protected ground. "Acts of violence against family members on account of a protected basis may demonstrate persecution if they show a pattern of persecution tied to the petitioner." Vonhm v. Gonzales, 454 F.3d 825, 828 (8th Cir. 2006) (quotation omitted). Malonga now asserts that government forces murdered his father on account of a protected ground, but all the record shows is that his father was shot and died of his injuries. Malonga's affidavit acknowledges that his father's death occurred during the context of the civil war in which thousands died, and the record demonstrates all factions in the 1998–1999 conflicts committed serious abuses. No clear evidence otherwise ties this unfortunate event to ethnicity or to Malonga's political opinion. These facts do not justify reversing the BIA.

-14-

B.  Clear Probability of Future Persecution

The BIA also held that Malonga did not face a clear probability of persecution on account of his ethnicity or his political opinion if returned to the Congo.  It stated in part:

> While there is ongoing conflict in the Congo, the respondent's previous problems occurred many years ago and there is little evidence that there is any ongoing interest in the respondent either due to his ethnicity or his political activities.  The respondent has failed to show any particularized fear or that his group, the Lari, face a pattern and practice of persecution in the Congo.

Malonga first objects to the BIA's reference to "fear" in its discussion of future persecution, claiming the BIA conflated the partially subjective analysis for asylum, see Cubillos v. Holder, 565 F.3d 1054, 1058 (8th Cir. 2009), with the entirely objective one for withholding of removal,  see I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 430–31 (1987).  We review *de novo* whether the BIA applied an erroneous legal standard.  See Makonnen v. I.N.S., 44 F.3d 1378, 1382 (8th Cir. 1995).  Although the BIA might have been more precise in its articulation of the analysis, we are not convinced this alone warrants reversal.  Looking at the analysis as a whole, we read the BIA's statement to mean that Malonga failed to show he will be singled out for persecution.  The BIA recited the "clear probability" standard for withholding of removal within the same paragraph and nothing else about the analysis suggests that the BIA actually required Malonga to prove a subjective element to warrant relief. Even if the BIA had improperly required him to do so,  Malonga testified that he did have such a subjective fear, and no one has questioned his credibility on this point.

Further, the record does not compel the conclusion that Malonga will more likely than not suffer persecution strictly on account of his ethnicity.   None of the evidence Malonga points to rebuts the BIA's observations that any problems he experienced because of his ethnicity happened a long time ago and that there is little

-15-

evidence of the government's interest in him on account of that ground. Additionally, Malonga has not articulated to this court any other reasons he would be singled out on account of his ethnicity separate from those due to political opinion, which he acknowledges is the more important of his two claims.

Nor can we say this record compels the conclusion that the Lari as whole face a pattern and practice of persecution. See 8 C.F.R. § 1208.16(b)(2)(i)-(ii). Malonga suggests that we must infer that the Lari face a pattern and practice of persecution because the Kongo, the larger ethnic group to which they belong, constitute the main ethnic group in the regions where much of the fighting occurred between southern rebels and the government. To that end, the record clearly shows that civilians in the southern regions of the Congo experienced significant, widespread abuses during the unrest of the 1990s and in 2002. What is largely lacking from this record, however, is evidence of a persecutory motive behind most of these acts. We heed the State Department's advice against oversimplifying these conflicts and decline to assume one. Statements in the various reports and articles indicate government-allied forces targeted some degree of violence at southern ethnic groups. None of these statements, however, identify the ethnicity of the victims as Lari. More fundamentally, to establish a pattern and practice "the persecution of the group must be systemic, pervasive, or organized." Tolego v. Gonzales, 452 F.3d 763, 767 (8th Cir. 2006) (quotation omitted). The record does not demonstrate that the Lari endured persecution during the conflicts or otherwise to the extent necessary to meet this high standard, even in light of specific instances of past mistreatment that Malonga cites.

That said, the BIA's analysis regarding the probability of future persecution based on political opinion troubles us for two reasons. First, we cannot tell from its opinion whether it considered Malonga's political activities after he left the Congo. Second, we think the BIA's pattern and practice analysis as to the Lari fails to account for the risks Malonga argues he would face as an actual or imputed political dissident.

-16-

In considering whether Malonga will be singled out for persecution, the BIA makes no mention of his continued membership in political groups in the Congo or his involvement with additional expatriate political organizations while residing in the United States. Although the IJ recognized some of these affiliations, neither the IJ nor the BIA analyzed the nature or level of Malonga's participation in the various groups since his departure or if his current activities might put him at risk. Given this, and reading the BIA's opinion as a whole, we interpret the BIA's observation that "there is little evidence there is ongoing interest in him" on account of his political activities as a conclusion based on past events. Further, if Malonga establishes that these activities have or are likely to draw the attention of persecutors, the BIA's observation that most of his problems happened years ago is of little consequence. Because we cannot determine from the agency's analysis whether it recognized and considered these issues, remand for further consideration is appropriate. See Barrangan-Verduzco, 777 F.2d at 426 (noting agency must sufficiently show it considered issued raised); Myat Thu v. Att'y Gen., 510 F.3d 405, 413–15 (3d Cir. 2007) (remanding when the IJ failed to consider material documentary evidence relevant to a well-founded fear due to petitioner's political activities outside native country); Woldu v. Ashcroft, 209 F. App'x 380, 381–82 (5th Cir. 2006) (unpublished per curiam) (remanding for reconsideration of a well-founded fear where the IJ and BIA failed to address relevant evidence and the IJ relied on past treatment in native country to find no future persecution). We express no opinion as to whether these post-departure affiliations and activities warrant relief.

Closely related is our concern that the BIA failed to include political dissidents in its pattern and practice analysis. The BIA simply held that the Lari did not face such a pattern and practice. We understand Malonga to argue that this analysis is insufficient for two reasons. First, it fails to account for the fact that he has been an actual political dissident, who, he claims, the record demonstrates face a substantial risk of persecution. Second, he argues that he runs a separate risk of having a political opinion imputed to him because he is a Lari from the Pool region, whose residents are

often assumed to oppose the government. Regarding the latter, Malonga points, for example, to the fact that during the 1998-1999 conflicts, police executed five men whose identity cards indicated they came from the Pool and were assumed to be members of the southern-based Ninjas or Cocoyes militias. He also draws our attention to a 1999 letter from his brother recounting reports that men of "fighting age" in the Pool were being summarily executed. This evidence tends to show, to some degree, the persecution of individuals imputed to be political opponents of the government and its allies. It additionally suggests that individuals like Malonga, particularly in terms of geographic ties, have been labeled as such and persecuted accordingly—even if the evidence does not compel the conclusion that the Lari as a whole face a pattern and practice of persecution.

The Attorney General counters that the BIA concluded Malonga's ethnicity and political opinion claims were intertwined and so properly considered the Lari as both the relevant ethnic and political group for purposes of the pattern and practice analysis. We think collapsing the analysis in this manner was inappropriate given the complex issues surrounding Malonga's political opinion claim. The pattern and practice analysis as we see it takes no account of Malonga's actual political activities or his many political affiliations, not all of which clearly coincide with his ethnicity. We also think the analysis does not account for the more subtle issue of imputed political opinion. We remand for further consideration in light of these concerns. See Hailemichael v. Gonzales, 454 F.3d 878, 884 (8th Cir. 2006) (remanding when the IJ failed to articulate reasoning sufficient to permit review); Makonnen, 44 F.3d at 1383–84 (remanding in part because the agency only considered whether the petitioner would suffer persecution on account of ethnic group, and not political group, where the two were closely related and it was likely that petitioner would not articulate a clear distinction between the two); see also Ayele v. Holder, 564 F.3d 862, 868–69 (7th Cir. 2009) (remanding where the IJ failed to fully consider the petitioner's family group claim, and if it did, improperly required evidence that the petitioner would be singled out).

-18-

For the reasons stated above, we grant the petition for review, vacate the BIAs' holdings regarding a clear probability future persecution on account of political opinion, and remand for proceedings consistent with this opinion. The BIA should consider Malonga's current political activities and affiliations would cause him to be singled out for persecution. It should also consider whether a pattern and practice of persecution exists as to actual and imputed political dissidents, and whether Malonga as a Lari from the Pool who has been an active political opponent of several regimes, is similarly situated to those individuals. On remand, the BIA is free to supplement the record with more current materials regarding country conditions in the Congo.

COLLOTON, Circuit Judge, dissenting.

The court convincingly explains why the record does not compel a conclusion that Noel Malonga suffered past persecution on a protected ground, that he faces a clear probability of future persecution based on his ethnicity, or that there is a pattern or practice of persecuting members of the Lari social group in the Congo. The court goes astray, however, when it remands the case to the Board of Immigration Appeals for a second time based on perceived deficiencies in its opinion.

The BIA must provide an adequate reasoned explanation of its decision, but it has "no duty to write an exegesis on every contention." *Averianova v. Holder*, 592 F.3d 931, 936 (8th Cir. 2010) (internal quotation omitted). Because the BIA rejected Malonga's claim for withholding of removal, and described the basis for its decision "with such clarity as to be understandable," *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), there is no reason for a remand.

The court concludes that the BIA's opinion is inadequate for two reasons. The court first says it cannot determine whether the BIA considered Malonga's political

-19-

activities after he left the Congo. *Ante*, at 16. But the BIA stated explicitly that "there is little evidence that there is *any ongoing interest* in [Malonga] either due to his ethnicity or *his political activities*." This conclusion is appropriately responsive to Malonga's three-sentence contention in his brief to the BIA about political activity after he left the Congo. (A.R. 191). Malonga argued only that he has continued "his allegiance and membership" in a political party, that he is a "member" of a political group of scholars, and that he has signed petitions criticizing the Congolese government that have been widely circulated in the United States, France, and the Congo. The BIA's opinion, fairly read, found little evidence that the government has any present interest in Malonga due to these political activities. That is a sufficient decision to permit judicial review, and the record does not compel a contrary conclusion.

The court's second reason for a remand is that the BIA's "pattern or practice analysis" fails to address persecution that Malonga might face as an "actual or imputed political dissident." *Ante*, at 16. The BIA answered Malonga's "pattern or practice" argument by concluding that Malonga had "failed to show . . . that his group, the Lari, face a pattern of persecution in the Congo." The BIA viewed this conclusion as responding to Malonga's arguments about both his social group and his political opinion, because Malonga's testimony did not differentiate between the two, and "it appear[ed] from the record that [Malonga's] politics were intertwined with his ethnic identity."

The court's criticism of the BIA – that the agency's opinion inappropriately viewed Malonga's claims based on ethnicity and political opinion as "intertwined," *ante*, at 18 – contradicts Malonga's own position in this court: "*As correctly acknowledged by the BIA*, Malonga characterized his problem in Congo as ethno-political; 'it appears that *his politics were intertwined with his ethnic identity*.'" (Appellant's Br. 24 n.2) (quoting *In re Malonga*, No. A073 063925, at 2 (BIA Apr. 27, 2009)) (emphasis added). The court's additional complaint that the BIA was required

-20-

to address the "Lari from the Pool region" separately from the "Lari as a whole," *ante*, at 17-18, and to consider whether the government would "impute" a political opinion to the former group but not to the latter, ignores this court's prior explanation that members of the Lari social group are "*identifiable . . . by* their concentration in southern Congo's Pool region." *Malonga v. Mukasey*, 546 F.3d 546, 554 (8th Cir. 2008) (emphasis added). The BIA adequately addressed the arguments raised by Malonga in his administrative appeal, and the record does not compel a contrary conclusion on the merits.

For these reasons, I would deny the petition for review.

_____