# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-1990

_____

Mathias Hounmenou; Corine Edith Hounmenou; Marine Celestine Hounmenou

*Petitioner*s

v.

Eric H. Holder, Jr., Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: March 15, 2012
Filed: September 11, 2012

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Mathias Hounmenou, Corine Edith Hounmenou, and Marine Celestine Hounmenou (collectively, Petitioners or Hounmenous) petition for review of a Board of Immigration Appeals' (BIA) decision affirming the immigration judge's (IJ) denial of their application for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act (INA), and protection under the United Nations Convention Against Torture (CAT). Petitioners contend that the BIA erred by

analyzing Mathias's fear of persecution based on the potential female genital mutilation (FGM) of his daughter as a derivative claim, instead of as a claim of direct persecution of Mathias. We deny the petition for review.

## I.

Mathias Hounmenou was born in Benin in 1962 and belongs to the Fom ethnic group. Mathias's extended family practices the Vodun religion (colloquially known as "voodoo"). However, when Mathias was young, his father converted to Roman Catholicism and raised Mathias in the Catholic Church despite the opposition of his family. After Mathias's father died, Mathias's father's relatives renewed their insistence that Mathias practice the Vodun religion and that his face be ritualistically scarred in accordance with their religious practices. They also insisted that Mathias's mother marry her deceased husband's brother, which was Fom custom at that time. Both Mathias and his mother successfully resisted the demands of Mathias's father's family.

Mathias subsequently left Benin to avoid his father's family. He met Corine, a citizen of both Benin and Senegal, while working in the Ivory Coast. After Mathias and Corine were married, they returned to Benin, where they were pressured by Mathias's family to raise their daughter, Marine, in the Vodun religion. According to Mathias, his uncles showed up at his house unannounced on several occasions and expressed their intent to take Marine to live in a Vodun convent, where she would be ritually scarred and subjected to FGM. Mathias and Corine became afraid that their daughter might be kidnapped while they were at work, especially after Mathias's uncles threatened to "use every means that they can to achieve their goal" of placing Marine in a Vodun convent. At a hearing before the IJ, Mathias explained that he did not involve the police—even though his brother was a police chief in Benin—because he believed they would either dismiss his complaint as a private family matter or refuse to take action out of fear that Mathias's uncles would cast Vodun spells against

them in retribution. Despite their threats, Mathias's extended family did not make any attempt to abduct Marine.

Nevertheless, due to his uncles' threats against Marine, Mathias decided that Corine and Marine should leave Benin and go to the United States. On February 16, 2004, Corine and Marine were admitted to the United States as nonimmigrant visitors for pleasure that were authorized to stay until August 15, 2004. Both Corine and Marine overstayed their visas without authorization and remained in the United States. According to Corine's testimony before the IJ, Corine's original intention was to remain in the United States with Marine only as long as the visa permitted in order to give her husband's family some time to "forget" about Marine. However, Marine's departure simply escalated the tension between Mathias and his uncles, and the uncles apparently threatened Mathias. According to Mathias, his uncles then retaliated against him by using Vodun spells to put him in a mysterious 13-hour coma which required his hospitalization. On April 6, 2006, Mathias left Benin and joined his family in the United States as a nonimmigrant visitor for pleasure with a visa which expired on October 5, 2006. Mathias also overstayed the terms of his admission.

Within a year of his arrival, Mathias filed an application for asylum and withholding of removal under sections 208 and 241(b)(3) of the INA, 8 U.S.C. §§ 1158 and 1231(b)(3), with the Department of Homeland Security (DHS). Mathias was lead petitioner on the application and Corine and Marine were derivative petitioners on the application. See 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 1208.21(a). In the application, Mathias argued that if he and his family were removed to Benin, Marine would be subjected to ritualistic FGM and body scarring as part of the Vodun religion practiced by Mathias's extended family. The DHS denied Mathias's application and charged Petitioners with being subject to removal under section 237(a)(1)(B) of the INA, which applies to aliens who remain in the United States longer than permitted when admitted as nonimmigrants. 8 U.S.C. § 1227(a)(1)(B).

A removal hearing for Petitioners was held before an IJ. Mathias, as lead petitioner, conceded removability and renewed his asylum application. Mathias also sought withholding of removal under section 241(b)(3) of the INA and the CAT. Mathias and Corine both testified as to the facts set forth above, and the IJ found that their "testimony was credible considering the totality of the circumstances." The IJ noted that FGM is estimated to be practiced on anywhere from 17% to 50% of the female population in Benin, with a great degree of variation between geographic areas and ethnic groups. The IJ also noted that FGM is illegal in Benin, though the law is not often enforced; Benin's constitution provides for freedom of religion; and Benin is home to a wide variety of religious practices, with the largest three groups being Roman Catholics (27.1%), Muslims (24.4%) and adherents of Vodun (17.3%).

The IJ then concluded that Mathias was ineligible for asylum, explaining that Mathias "cannot file a claim of asylum based on future FGM relating to his daughter. . . . A parent of an applicant . . . cannot maintain a derivative asylum claim based upon a child's claim." The IJ further held that "even were the Court to find that [Mathias] could receive a grant of asylum through his daughter, he has not met his statutory burden in showing either past persecution or a well-founded fear of future persecution." The IJ noted that "there was no evidence presented that [Mathias's] family ever acted on any of their threats" and that Mathias's relatives had never tried to abduct Marine despite testimony from Mathias and Corine that "his family could have easily taken Marine had they so wanted." The IJ also acknowledged that Mathias's father successfully raised Mathias as a Catholic and was able to resist pressure from relatives who wished to see Mathias join the Vodun religion. Finally, the IJ observed that Mathias and Corine "adamantly oppose FGM" and that "[a]s practicing Catholics, [Petitioners] do not fall into one of the religious groups in which FGM is prevalent." Accordingly, the IJ found a lack of "sufficient evidence that [Marine] would face future persecution based on FGM." Petitioners' applications for withholding of removal and for relief under the CAT were also denied for the same

-4-

reasons as Mathias's asylum claim. In its order, the IJ granted Mathias's request for voluntary departure.

Petitioners appealed the IJ's decision to the BIA, which dismissed the appeal and upheld the IJ's denial of asylum, withholding of removal under INA section 241(b)(3), and relief under the CAT. In reviewing Mathias's claim of having a well-founded fear of persecution, the BIA noted that Mathias testified that his "paternal relatives did not subject his daughter to FGM because '[he] did not allow it.'" The BIA also agreed with the IJ that Marine's "risk [of] suffering forced FGM was lessened" due to Mathias's and Corine's objections to the practice and their family's Catholic faith. The BIA further concluded that Mathias's claim was a derivative claim "based primarily on the fear that his daughter will be harmed in Benin" and should fail for that reason. However, the BIA remanded the record for the IJ to reevaluate its grant of voluntary departure because Mathias failed to submit proof of having paid a required bond under 8 C.F.R. § 1240.26(c)(3)(ii). The IJ subsequently rescinded its decision to grant Petitioners voluntary departure.[1] The Hounmenous

[1]This petition for review was filed before the IJ considered the issue of voluntary departure on remand that raised the question of whether the BIA's determinations on the issue of removal were "final." The statute governing petitions for review of BIA decisions limits our jurisdiction to "final order[s] of removal." 8 U.S.C. § 1252(a)(1). We have yet to address whether the BIA's remand for voluntary departure considerations renders its removal order non-final and deprives our court of jurisdiction. See Castillo-Castillo v. Holder, 465 F. App'x 575, 575-76 (8th Cir. 2012) (unpublished per curiam) ("[a]ssuming without deciding that there is a final order" where the BIA ordered the petitioner removed but then "remanded the matter to the IJ for [the petitioner] to apply for voluntary departure"). Other courts have addressed this issue, reaching various results. See, e.g., Pinto v. Holder, 648 F.3d 976, 978 (9th Cir. 2011) ("[A] BIA decision denying relief from deportation but remanding the case for voluntary departure proceedings [is] a final order of deportation."); Hakim v. Holder, 611 F.3d 73, 79 (1st Cir. 2010) (declining to exercise jurisdiction over a petition for review for "prudential reasons" without determining whether a BIA order denying relief and remanding for voluntary

now petition for review of the BIA's orders regarding their asylum, withholding of removal, and CAT claims.

## II.

The Attorney General has the discretion to grant asylum to "an alien who is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1101(a)(42)(A)). "Eligibility for withholding of removal requires proof of a clear probability that the alien's life or freedom would be threatened on the basis of one of these specified grounds if removed to the country in question, which is a more demanding standard than the well-founded fear of persecution standard for asylum." Osonowo v. Mukasey, 521 F.3d 922, 926 (8th Cir. 2008). Accordingly, it is impossible for an alien who fails to meet the criteria for asylum to show eligibility for withholding of removal. Id. Finally, relief under the CAT requires an alien "to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). "When the BIA adopts and affirms the IJ's decision, but also adds reasoning of its own, we will review both decisions together." Chen v. Mukasey, 510 F.3d 797, 800 (8th Cir. 2007).

We have held that "there is no doubt that the range of procedures collectively known as female genital mutilation rises to the level of persecution within the meaning of our asylum law." Hassan v. Gonzales, 484 F.3d 513, 517 (8th Cir. 2007) (citation and quotation marks omitted). However, we have also held that "an

---

departure considerations is a final order). However, now that the IJ has resolved the issue of voluntary departure and there has been no administrative appeal of its decision, the finality of the BIA's removal order is no longer in question. We therefore have jurisdiction over this petition for review.

-6-

applicant may not establish a derivative claim for withholding of removal based upon the applicant's child's fear of persecution" in the form of FGM. Gumaneh v. Mukasey, 535 F.3d 785, 789 (8th Cir. 2008).

Generally, "[w]e review the BIA's denial of an application for asylum, withholding of removal, and relief under the CAT using the deferential substantial evidence standard." Sow v. Mukasey, 546 F.3d 953, 956 (8th Cir. 2008). Under this standard, "'[w]e will not overturn an agency's decision unless the petitioner demonstrates that the evidence not only supports a contrary conclusion, but *compels* it.'" Malonga v. Holder, 621 F.3d 757, 764 (8th Cir. 2010) (citation and alteration marks omitted). However, Petitioners' sole argument in this petition for review is that the BIA and the IJ erred as a matter of law by failing to recognize that the "threat of female genital mutilation and body scarring to [Marine] constituted a direct persecution of Mathias." Mathias contends that the IJ and the BIA wrongly characterized his claim as an impermissible derivative claim. He argues that subjecting his daughter to FGM would be equivalent to a direct act of persecution and torture against Mathias himself. Mathias further contends that remand is necessary for the BIA to specifically address Mathias's fear that his daughter will suffer FGM in its analysis of his asylum and withholding of removal claims.

Mathias relies primarily on Kone v. Holder, 620 F.3d 760 (7th Cir. 2010), to argue that remand is necessary in this case. In Kone, the lead petitioner sought asylum and relief under the CAT, claiming that her removal to Mali would result in her daughter, a United States citizen, becoming a victim of FGM. 620 F.3d at 761. The IJ "determined that it was more likely than not that [Kone's daughter] would be forced to undergo FGM," id. at 762, but concluded that Kone's claim was an impermissible derivative claim, id. at 763. On appeal to the BIA, Kone argued that if her daughter suffered FGM, it would constitute direct persecution of Kone and her husband under the CAT. Id. at 763. The BIA agreed with the IJ that Kone's claim was an impermissible derivative claim and denied Kone's appeal. Id. However, the

Seventh Circuit accepted Kone's argument, concluding that "the prospect of FGM of one's child can constitute harm to an unwilling parent." Id. at 765. Accordingly, the court remanded the case for the BIA to consider whether Kone successfully made out claims of "direct, as opposed to derivative, persecution of the petitioner." Id.; see also Kone v. Holder, 596 F.3d 141, 153 (2d Cir. 2010) (remanding a petitioner's claim for the BIA to consider whether "a mother who was herself a victim of genital mutilation" experiences persecution when her daughter may "suffer the same fate"); Abay v. Ashcroft, 368 F.3d 634, 642 (6th Cir. 2004) (recognizing that a petitioner for asylum and withholding of removal can demonstrate direct persecution based on the harm of "being forced to witness the pain and suffering of her daughter" if she were subjected to FGM).

Our circuit has not yet addressed the question of whether the threat of FGM to a petitioner's daughter constitutes direct persecution or torture of the petitioner within the context of asylum, withholding of removal, and CAT claims. But after carefully reviewing the record, we find that we do not need to decide the question here. The IJ did not reject Mathias's claim solely because it was found to be derivative of his daughter's claim. Unlike the background facts in the Seventh Circuit's Kone decision, the IJ and the BIA in this case did not determine that it was more likely than not that Marine would be subjected to FGM. Rather, the IJ reached the opposite conclusion, finding that Mathias failed to "provide[] sufficient evidence that his daughter would face future persecution based on FGM." The BIA also held that the IJ "properly concluded that [Marine's] risk [of] suffering forced FGM was lessened" because Mathias and Corine are strongly opposed to the practice and because the Hounmenous are practicing Catholics. Assuming without deciding that Mathias was entitled to raise a claim of direct persecution based on the threat of FGM to his daughter Marine, such a claim would necessarily fail because the IJ expressly found that Marine herself did not have a well-founded fear of being subjected to FGM. Under the circumstances, we cannot say that the IJ or the BIA "overlooked a key

aspect of [Mathias's] claim and that a more complete evaluation is necessary." See Kone, 620 F.3d at 764.

Both the IJ and the BIA premised their conclusion that Mathias did not demonstrate a well-founded fear of persecution or the likelihood of torture on the finding that Marine is unlikely to be subjected to FGM. The IJ and the BIA gave great weight to the fact that Mathias's father and mother, and Mathias himself, were consistently able to resist the pressure from his extended family to participate in the Vodun religion. The IJ and the BIA also relied on the evidence that the threats from Mathias's extended family have never been acted upon. Both further noted that Benin's history and demographic statistics support the finding that a Catholic female raised by parents who oppose FGM does not face a well-founded fear of persecution in the form of FGM. Petitioners have failed to show that the evidence necessarily compels a conclusion contrary to the BIA's decision. See Malonga, 621 F.3d at 764. We therefore conclude that the decisions of the IJ and the BIA were supported by "substantial evidence" and that this is not a case where the BIA "might reach a different conclusion after a more complete evaluation of the record." See Kone, 620 F.3d at 763 (quotation omitted).

III.

For the foregoing reasons, we deny the petition for review.

———————————————————