# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2925

_____

Leonard Sholla,                                     *
                                                    *
                    Petitioner,                     *
                                                    *   Petition for Review of an Order of the
            v.                                      *   Board of Immigration Appeals.
                                                    *
Alberto Gonzales, Attorney General                  *
of the United States of America,                    *
                                                    *
                    Respondent.                     *

_____

Submitted: March 15, 2007
Filed: July 5, 2007

_____

Before MELLOY, SMITH, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Leonard Sholla, a native and citizen of Albania, entered the United States with a valid tourist visa. Shortly after the visa expired, Sholla submitted an application for asylum, withholding of removal, and relief under the Convention Against Torture in which he alleged that he was the victim of political persecution in his native country. An immigration judge ("IJ") denied these applications, and the Board of Immigration Appeals ("the Board") adopted and affirmed the IJ's decision. Sholla petitions this court for review of the denial of his applications for relief, and we grant the petition.

# I. BACKGROUND

Sholla arrived in the United States from Albania on December 2, 2000, with a valid tourist visa. The visa expired on June 1, 2001. On June 20, 2001, Sholla applied for asylum, withholding of removal, and relief under the Convention Against Torture. On October 31, 2002, immigration authorities served him with a notice to appear charging that he was a removable alien under 8 U.S.C. § 1227(a)(1)(B). Sholla appeared before the immigration court in Chicago and admitted removability, and an IJ set a date to hear the merits of his applications for relief. After a venue transfer to St. Louis, Sholla had his merits hearing via video conference before an IJ in Oakdale, Louisiana, on September 29, 2004.

The facts presented below derive from the testimony of Sholla and his brother Milto, the only witnesses at the hearing. Their testimony was uncontradicted by the government and found credible by the IJ, and we therefore present it as such.

Sholla was born in Kuçovë, Albania, in 1951. He was the oldest of six brothers: himself, Milto, Nikollaq, Jovan, Koco, and Vasillaq. During his childhood and much of his adult life, Albania was under Communist rule. Sholla listened to Voice of America and Radio Vatican and soon became an ardent supporter of democratic reforms and a harsh critic of the Communist regime. He spoke to friends, family, and "whoever would listen" about his beliefs. Someone in the Albanian government learned of his anti-Communist advocacy. In 1980, Communist authorities arrested Sholla and placed him, his wife Zoica, and his then-two-year-old daughter Valbona in a hard-labor internment camp. The three were released in 1981.

Three of Leonard's brothers—Milto, Nikollaq, and Jovan—also became active in the anti-Communist political movement, and Jovan's political activities led to his arrest and internment from 1988 to 1990. The four brothers joined the Democratic Party in Kuçovë upon its official formation in 1991. Sholla served as the chairman

of the party commission in his electoral zone. Milto and Nikollaq both served terms as secretary of the party commission, and Jovan took an active role in party publicity. The Democrats prevailed in the 1992 elections at the national level, although the Socialist Party won in Kuçovë. The 1996 elections brought the same result.

The Albanian economy collapsed in early 1997, citizens rioted in the streets, and the prime minister (a Democrat) resigned. The parties formed a coalition government in March of that year and set an early election date for the new government in late June. Sholla and his brothers campaigned for the Democrats and appeared at rallies and meetings for the party in May and June. The police at that time were controlled by the Socialists, and Sholla faced numerous threats from police officers during the campaign. On three occasions, those threats were accompanied by violence. In May 1997, police officers approached Sholla after a Democratic promotional event in the town of Gegë and stated that they needed to "clarify some things" with Sholla. They pushed him into a van, told him that he must withdraw from the party or they would make him "disappear," and beat him with rubber batons until he lost consciousness. The police were gone when he awoke, and two strangers found him and returned him to his home. It took three days for Sholla to recover from the beating, which bruised his body and left a permanent scar on his upper lip.

Less than one month later, Sholla was returning from a party meeting when he was stopped by two officers, one of whom he recognized and identified by name for the IJ. They led him to their car, drove him to another location, and told him to cease his campaigning efforts for the Democrats. Sholla refused. The officers beat him while making threats against his life and the lives of his family members. Sholla suffered bruises on his arm and head, and he carries a scar on the left side of his head from the beating. He believed that the officers did not kill him because, due to his prominent position in local Democratic politics, the murder would have been "big news." He spent two days recovering from his injuries and then continued his campaign efforts undeterred. Three weeks later and four days before the election, as

a peaceful demonstration of Democrats was winding down in Kuçovë, Sholla was again accosted by police officers who threatened his life and beat him "in a barbarous way." Nicollaq was beaten by two different officers on the same day.

The Socialists won the 1997 election, and Sholla and his brothers continued their work for the Democratic Party. In January 1998, a bomb exploded in Milto's house, wounding Milto's youngest son. He reported it to police, but investigators took no action. Milto and his family slipped away to a different part of the country and traveled to the United States in September of that year. He was granted asylum.

Around the same time that Milto arrived in the United States, a bomb destroyed Jovan's store. Jovan reported it to the authorities, and the chief of police told him that "next time his head would disappear." Jovan accused the local police of setting the bomb. As a result of his allegations, police arrested and interrogated him but did not file formal charges. Jovan and his family went into hiding and ultimately sought refuge in the United States, where Jovan was granted asylum.

Sholla remained in Albania during the two years following the bombings. On the night of September 27, 2000—mere days before a local election—masked men came to his door, armed with AK-47 assault rifles. They stood outside and sprayed gunfire into Sholla's home. Sholla escaped the attack unharmed, but a bullet wounded the left leg of his youngest son, Arnato, who was then fifteen years old. Sholla attached a photo of the wound, as well as photos of the bullet holes in his door, to his application for asylum. Sholla reported the attack to the authorities, but they took no action. He believes the Socialist police were behind the attack because he never received any threats from anyone else.

Sholla and his family fled to stay with his in-laws in Sarandë, Albania. Sholla obtained a tourist visa from the U.S. Embassy and entered the United States on December 2, 2000. His wife paid $15,000 for false documentation and entered the

country illegally two years later to rejoin her husband. Their three children remain with his wife's family in Albania. Nikollaq also left Albania and came to the United States at the same time as Sholla, and he was granted asylum one month prior to Sholla's hearing by a different IJ in the same immigration court as the IJ who decided Sholla's case.[1]

Milto testified at Sholla's hearing, as well. He corroborated Sholla's testimony concerning the family's extensive political involvement, the beatings by police, and the brothers' fear for their lives in Albania. He also authenticated Sholla's photographs of a wounded Arnato and the aftermath of the assault-rifle attack on Sholla's home.

Sholla's application for asylum included: (1) a letter from the head of the Kuçovë branch of the Democratic Party describing Sholla's party activism and corroborating the attacks against him; (2) a document from the Ex-Politically Persecuted Association in Albania stating that Sholla was a member of the group and

---

[1]Sholla pointed out this fact in a pre-hearing brief to the IJ, stating that his brother "was recently granted political asylum by this court." In the margin of the brief, which appears in the record before us, the IJ included a handwritten comment: "NOT BY THIS COURT - [the IJ's signature]." We respect the autonomy of individual adjudicators in our legal system and recognize that the IJ was not bound by the prior decision of a colleague to grant asylum to Sholla's brother. Nevertheless, we note that this statement is disrespectful to both Sholla and the judgment of a fellow IJ, suggests prejudice, and borders upon the kind of inappropriate commentary that has drawn harsh criticism from our sister circuits. See, e.g., Benslimane v. Gonzales, 430 F.3d 828, 829-30 (7th Cir. 2005) (collecting cases). Although the IJ's comment ultimately has no bearing upon our decision in the present case, we have found similar comments to be material to the outcome of other appeals. See, e.g., Tun v. Gonzales, 485 F.3d 1014, 1027 (8th Cir. 2007) (finding that an alien's due process rights were violated as a result of numerous instances of unfairness in his asylum proceedings, including the fact that "the IJ's assessment . . . contained commentary . . . that suggests the IJ may not have acted as a neutral arbiter").

had been imprisoned in 1980 for political activities; and (3) other documentation verifying his identity and the identities of his family members.

The IJ rendered an oral decision at the close of the hearing. The decision summarized Sholla's testimony, noting the numerous incidents of violence against him and his brothers and the apparent political motives behind many of the incidents. The IJ found Sholla's testimony to be credible, although it was "somewhat troubl[ing] that the respondent knew of the [three beatings in 1997] and described them in detail but his corroborative witness, his brother, . . . seemed to believe that one of the events happened in 1997 while the other two occurred in 1998." This perceived discrepancy was illusory. In reality, Milto testified that Sholla was beaten once in May 1997 and twice in June 1997, and that Sholla suffered an attack on his home in 2000, after Milto had fled to the United States. Sholla's testimony was identical as to the timing of the beatings and the attack on his home.

The IJ proceeded to deny Sholla's claims for asylum, withholding of removal, and relief under the Convention Against Torture. As to asylum and withholding of removal, the IJ did not dispute the events described in Sholla's testimony, but nevertheless found "that the things that happened to [Sholla] in 1997 are not sufficient to meet the burden of proof that the respondent has a well-founded fear of future persecution" because the record included reports asserting that conditions in Albania have improved since that time. As to the assault-rifle attack, the IJ gave it little weight and did not credit Sholla's circumstantial evidence of a political motive, concluding that "there's just not enough evidence to show" that it was carried out or directed by police officers, or that they acquiesced in it. In sum, the IJ's opinion largely ignores the question of whether the internment, beatings, and assault-rifle attack constituted past persecution, even though the IJ found Sholla credible and noted that the country reports supported Sholla's testimony regarding the past incidents of violence against him. The IJ's opinion contains only one clause addressing the issue of past persecution: "while the respondent may have been harassed or even subject to police

brutality on some isolated occasions seven years ago, the Court cannot find that rises to persecution within the meaning of the [Immigration and Nationality] Act."

The IJ also denied Sholla's claim for relief under the Convention Against Torture, finding that "there is nothing to show that the experiences that the respondent suffered were so severe that they amount to torture within the meaning of the regulations."

Sholla appealed to the Board, and it adopted and affirmed the decision of the IJ without comment.

## II. DISCUSSION

In an asylum case, "[w]e review the Board's factual findings for substantial evidence and its legal determinations *de novo*." Ntangsi v. Gonzales, 475 F.3d 1007, 1011 (8th Cir. 2007). When the Board affirms the decision of the IJ without a separate opinion, we review the decision of the IJ. Bushira v. Gonzales, 442 F.3d 626, 630 (8th Cir. 2006). Under the substantial evidence standard, we must affirm unless the evidence is "so compelling that no reasonable factfinder could fail to find" that the petitioner qualifies for asylum. INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992).

To meet the eligibility requirements for asylum relief, an applicant must show that he is "unable or unwilling to return to . . . [the designated country for removal] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Persecution is "an extreme concept" that excludes "[l]ow-level intimidation and harassment." Shoaira v. Ashcroft, 377 F.3d 837, 844 (8th Cir. 2004) (quotation omitted). It is also a "fluid concept," Bellido v. Ashcroft, 367 F.3d 840, 843 (8th Cir. 2004), one this court has defined to include the threat of death, the threat or infliction of torture, and the threat or infliction of injury to one's person or

one's liberty on account of a protected ground. <u>Regalado-Garcia v. INS</u>, 305 F.3d 784, 787 (8th Cir. 2002). If an alien establishes that he was the victim of past persecution, the IJ must presume that his fears of future persecution on the same basis are well-founded. 8 C.F.R. § 1208.13(b)(1). The burden of proof then shifts to the government. <u>Id.</u> § 1208.13(b)(1)(ii). To meet this burden, the government must show, by a preponderance of the evidence, that there has been a "fundamental change in circumstances" that renders the alien's fears of persecution unfounded, or that the alien could effectively and reasonably avoid persecution by relocating to another part of the country of removal. <u>Id.</u> § 1208.13(b)(1)(i)(A), (B).

At the outset, we note that the IJ's opinion did not proceed according to analytical framework of 8 C.F.R. § 1208.13. Sholla clearly and unquestionably alleged past persecution by state officers on account of his political beliefs. This allegation raises the threshold question of whether he met his burden of proof to establish past persecution, which would entitle him to the presumption of a well-founded fear of future persecution in his native country. The IJ's opinion either ignores this initial step or conflates it with steps that would become appropriate only after deciding this threshold issue. When an alien alleges past persecution, the IJ commits legal error if she fails to make a finding on whether the alien did in fact establish past persecution. <u>See</u> <u>Bushira</u>, 442 F.3d at 631-33. In such cases, we will generally remand the case to the Board to make such a determination and apply the correct legal standard. <u>Id.</u> at 633.

The opinion proceeds as if Sholla had never sought the benefit of the presumption based on past persecution: the IJ describes the incidents in Sholla's testimony in light of evidence of improved conditions in Albania and concludes that Sholla failed to "meet the burden of proof to show that [he] has a well-founded fear of persecution." Without more, this would warrant remand under the reasoning of <u>Bushira</u>. <u>Id.</u> at 631-33. Several pages later, however, the opinion does include an isolated, conclusory statement that the incidents described by Sholla "do not rise[] to

persecution." While we question whether this statement amounts to a clear, cogent finding on the issue of past persecution given its context, it is nevertheless possible to characterize it as a finding that Sholla failed to establish past persecution because the IJ believed the incidents in his past were not severe enough to constitute persecution.[2]

Fortunately, we need not engage in a delicate interpretation of the IJ's opinion; the question of whether the IJ's statement amounted to a finding on the issue of past persecution is ultimately irrelevant to our disposition of this case on appeal. Even if the IJ did make such a finding, substantial evidence would not support it. For the reasons discussed below, we believe the record compels any reasonable factfinder to conclude that Sholla suffered past persecution on a protected ground.

Sholla, his wife, and his toddler daughter spent two years in a hard-labor camp because Sholla preached the tenets of democratic government in a Communist state. One of his brothers served a three-year internment for the same reason. After the Cold War ended, Sholla and his brothers took an active role in promoting the newly-formed Democratic Party in Albania. In the three years before Sholla fled Albania, the Socialist-backed police threatened Sholla and his family members with death, singled out and brutally beat Sholla on several occasions with rubber batons, beat at least one

---

[2]The IJ stated that the country reports gave "no indication that the Socialist Party, either through its own organization or through the government, is engaging in any pattern of repression or violent behavior against opponents." While we question that reading of the record, we also note that the absence of a pattern and practice of persecution by government officials does not determine the question of whether Sholla suffered past persecution. See Corado v. Ashcroft, 384 F.3d 945, 947 (8th Cir. 2004) (per curiam) ("We consistently have defined persecution . . . without any suggestion of a 'pattern and practice' requirement."). A pattern and practice of persecution in a given country becomes relevant only if an alien has not shown past persecution or any evidence of a "reasonable possibility that he or she would be singled out individually for persecution." See 8 C.F.R. § 1208.13(b)(2)(iii).

of his brothers, and ordered Sholla to cease his political activities. One brother's home was bombed, wounding Sholla's nephew. Another brother's store was bombed, and a police officer told his brother that "next time his head would disappear." Masked men with assault rifles fired bullets into Sholla's home, wounding his youngest son. Sholla provided corroborating evidence of these events, including his brother Milto's consistent testimony, and the IJ specifically found Sholla credible and gave no valid reasons for questioning the veracity of his claims.

In short, Sholla's persecutors made numerous and credible threats to kill Sholla and his family because of their political activities, punctuated by savage beatings, imprisonment, bombings, and high-caliber gunfire directed at his home. This country's asylum statute would be quite hollow indeed if our definition of persecution required Sholla to wait for his persecutors to finally carry out their death threats before Sholla could seek refuge here. Our accepted definition of persecution is far less demanding, and the numerous incidents that Sholla describes fall squarely within it. Therefore, we find the evidence sufficient to compel a finding of past persecution.

Sholla was therefore entitled to the presumption of a well-founded fear of future persecution, which shifts the burden to the government to prove either: (1) that there has been a "fundamental change in circumstances" that negate his otherwise well-founded fears of persecution, or (2) that it would be reasonable for Sholla to live in a different part of Albania and that he could avoid persecution by doing so. 8 C.F.R. § 1208.13(b)(1)(i). The IJ did discuss the current country conditions in Albania and raised the possibility of relocation, but never with the burden of proof upon the government. On the contrary, the IJ repeatedly emphasized that the burden of proof was upon Sholla, even when discussing changed country conditions. The IJ does not so much as mention the possibility of shifting the burden of proof to the government.

The opinion does state that "circumstances and conditions in Albania have changed to such an extent that . . . respondent and his family could return at this time." Arguably, this statement could reflect an alternative holding that the government had

shown changed country conditions by a preponderance of the evidence. Given the context of the opinion as a whole, however—including its constant reference to Sholla's burden and its general analytical infirmity—we cannot assume that this lone, ambiguous statement constitutes a clear alternative holding upon which we may affirm the denial of Sholla's asylum claim. In short, the IJ has not yet considered the question of whether the government met its burden of proving that Sholla's presumptively well-founded fear of future persecution is no longer sound due to a "fundamental change in circumstances" in Albania.

We hold that the evidence would compel any reasonable factfinder to conclude that Sholla had suffered past persecution. We remand this case to the Board for reconsideration of Sholla's claim, with the burden upon the government to prove that Sholla's fear of future persecution is no longer well-founded because of recent, fundamental changes in Albania, or because Sholla could safely and reasonably relocate to a different region of Albania.

## III. CONCLUSION

For the foregoing reasons, we grant the petition for review.

―――――――――