# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1345
No. 07-1351

_____

Istvan Beck, Hilda Beckne Aranyi,    *
                                      *
        Petitioners,            *
                                      *
      v.                    *   Petitions for Review of Orders
                                      *   of the Board of Immigration Appeals.
Michael B. Mukasey, Attorney      *
General of the United States,       *
                                      *
        Respondent.            *

_____

Submitted: January 18, 2008
Filed: May 28, 2008

_____

Before LOKEN, Chief Judge, HANSEN and MURPHY, Circuit Judges.

_____

LOKEN, Chief Judge.

Petitioners Istvan Beck and his wife, Hilda Beckne Aranyi, are natives and citizens of Hungary who entered the United States in 2001 and stayed past the period authorized by their non-immigrant visas. Separate removal proceedings commenced in October 2003 and were later consolidated. Petitioners conceded removability and applied for asylum and withholding of removal, claiming each would be persecuted on account of their Romani (gypsy) ethnicity if returned to Hungary. After a hearing, the Immigration Judge ("IJ") denied the asylum applications as untimely, denied withholding of removal on the merits, and ordered Petitioners removed to Hungary.

The Board of Immigration Appeals ("BIA") affirmed in separate, brief opinions. Petitioners seek judicial review of their final orders of removal. See 8 U.S.C. § 1252(b). We consolidated and now deny the petitions for review.

**Asylum.** The BIA held that Petitioners are ineligible for asylum because they did not apply within one year of entering the United States and failed to show extraordinary circumstances excusing this failure. See 8 U.S.C. § 1158(a)(2). Petitioners urge us to review these rulings but acknowledge our prior decisions holding that we lack jurisdiction to do so. See, e.g., Miah v. Mukasey, 519 F.3d 784, 787 (2008). As a panel, we are bound by those decisions.

**Withholding of Removal.** The Attorney General may not remove Petitioners to Hungary if he decides "that [their] life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). If Petitioners prove that they suffered past persecution in Hungary on account of a protected ground such as race, they are entitled to a rebuttable presumption of future persecution. See 8 C.F.R. § 1208.16(b)(1). Absent a showing of past persecution, they must show a clear probability of future persecution on account of a protected ground if they are removed to Hungary. See INS v. Stevic, 467 U.S. 407, 424-28 & n.19 (1984). This requires proof they will "more likely than not" suffer such persecution, which is a more demanding standard than that for asylum. Compare 8 C.F.R. § 1208.16(b)(2), with 8 C.F.R. § 1208.13(b)(2)(B); see Alemu v. Gonzales, 403 F.3d 572, 576 (8th Cir. 2005). Petitioners challenge the BIA's adverse findings on these issues. We review the agency's fact finding under the deferential substantial evidence standard. Miah, 519 F.3d at 787. In these cases, the findings of no past persecution are dispositive.

At the evidentiary hearing, Beck testified that, when he was growing up in the 1970s and 1980s, he and other Roma students had to sit in the back of classrooms, where the teachers ignored them. Roma students were not allowed to join student

activities or use playgrounds and were harassed by other students. As a teenager, Beck enrolled in trade school to become an electrician, where he received less attention from the teachers. Once, when Beck told a teacher that his roommates had spread feces in his living space and told him this was the proper habitat for Roma, the teacher laughed and ordered him to clean up the mess. After graduation, Beck applied for numerous electrician positions but was rejected. He returned to his home town and worked at an agricultural cooperative.

Aranyi, too, suffered discrimination in school. She was forced to sit in the back of classrooms, was ignored and even beaten by teachers, and her classmates threw books at her, saying Roma did not need books. Aranyi entered nursing school, where she was forced to sit in the back of classrooms and was barred from student activities. After graduation, her only job offer was to give enemas at a hospital. She was fired from that job when another employee lost a necklace, and the staff blamed Aranyi. Lacking other job options, she moved back to her home town to work as a fruit and vegetable picker.

In 1994, after several years working in agriculture, Beck and Aranyi, now married, moved to Budapest. Beck unsuccessfully sought work as an electrician. He worked as a dishwasher and then did manual work in an agricultural neighborhood outside the city. Aranyi was told by many employers they did not hire Roma. She was eventually hired by a sporting goods store but left or was terminated after the manager demeaned and threatened her when she complained of sexual harassment by a supervisor. She found another job but was accused of stealing money and fired.

Both Petitioners testified to being physically assaulted by "skinheads" because they are Roma. In 1995, Aranyi was attacked by two skinheads while waiting at a bus stop. They called her a "dirty whore" and pushed her to the ground, causing a minor head injury. She filed a police report, but the investigation was closed when the police could not find the suspects. In 1998, Beck was waiting at a bus stop when two

skinheads attacked him with a baseball bat, declaring that Romani people should return to India, their ancestral home. He suffered broken ribs and skin lesions and needed knee surgery. Witnesses mocked him and fled the scene. Beck filed a police report, but the police eventually notified him that they were discontinuing the investigation because they could not find the culprits. In 2000, Beck and Aranyi were in a line for food when Beck was pushed and kicked and told to go to a pigsty, where gypsies belong. When Beck refused to leave the line, he was hit in the forehead, requiring first aid. He reported the incident to a policeman, who "was very sympathetic and put a band aid over my injury." Beck filed a police report, but again the suspects were never found.

Based on Petitioners' credible testimony and Department of State country reports, the IJ found "pervasive countrywide discrimination against Roma or gypsies" resulting in Petitioners being "relegated to lower societal and economic opportunities." However, the IJ denied them withholding of removal to Hungary because Petitioners failed to prove past persecution or a clear probability of future persecution. The IJ found that the harassment and discrimination Petitioners suffered at school and at work did not rise to the level of persecution, the physical assaults by skinheads were criminal acts by persons not connected to the government, and the police made significant efforts to investigate those crimes. The BIA affirmed the denial of withholding of removal for the reasons stated by the IJ. Because the BIA adopted the IJ's reasoning, we review both decisions as the final agency action. See Falaja v. Gonzales, 418 F.3d 889, 894 (8th Cir. 2005).

Petitioners argue that the skinhead physical assaults established past persecution. However, Petitioners could not identify their attackers to the police and submitted no evidence that the government directed or condoned the assaults, or that the police failed to act on their reports of these crimes. Rather, the police accepted Petitioners' reports, investigated the incidents, and notified Petitioners that the suspects could not be found. In these circumstances, substantial evidence supports the

BIA's finding that Petitioners failed to prove that the assaults were either condoned by the government or were committed by private actors "that the government was unwilling or unable to control." Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005) (quotation omitted).

Petitioners further argue that the workplace discrimination they suffered on account of their Romani ethnicity was the kind of "severe economic deprivation" that rises to the level of non-physical persecution. Petitioners rely primarily on In re T-Z-, 24 I & N Dec. 163, 170-75 (BIA 2007), a decision issued some months after the BIA's rulings in these cases that clarified the agency's standard for evaluating claims of economic persecution. In their Notice of Appeal to the BIA, however, Petitioners instead argued that their testimony described economic persecution that met the persecution standard of the Sixth Circuit in Ouda v. INS, 324 F.3d 445, 454 (6th Cir. 2003), where the court held that "[p]ersecution can include threats to life and economic restrictions so severe that they constitute a real threat to life or freedom" (quotation omitted). That standard was consistent with many prior decisions of this court. See Makatengkeng v. Gonzales, 495 F.3d 876, 882-84 (8th Cir. 2007); Ahmed v. Ashcroft, 396 F.3d 1011, 1014 (8th Cir. 2005); Fisher v. INS, 291 F.3d 491, 497 (8th Cir. 2002). Petitioners have failed to persuade us that the BIA's subsequent decision in T-Z- reflected a change in the agency's governing standard that requires a remand. See Makatengkeng, 495 F.3d at 883.

Substantial evidence supports the BIA's finding that Petitioners failed to meet this rigorous standard. Being relegated to low-level jobs despite their advanced schooling reflected unfair prejudice and discrimination, but private employment was available, so the economic discrimination was not "sufficiently harsh to constitute a threat to life or freedom." Ahmed, 396 F.3d at 1014. As the Seventh Circuit stated in rejecting a Bulgarian Roma's claim of persecution in Mitreva v. Gonzales, 417 F.3d 761, 764 (7th Cir. 2005), "An individual who earns a degree and finds work has no claim of economic persecution."

For these reasons, each Petitioner has failed to prove past physical or economic persecution. For the same reasons, substantial evidence supports the BIA's findings that they failed to show a clear probability of future persecution if they are removed to Hungary. Moreover, the State Department has reported that the Hungarian government actively examines allegations of discrimination against the Romani community, fines institutions that segregate or ban Roma, and is considering an affirmative action law. In this governmental environment, the likelihood of future economic persecution is reduced.

We deny the petitions for review.

_____