# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 09-3416/10-2483

_____

| | | |
|---|---|---|
| Tarique Majeed Shaghil, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petitions for Review of |
| v. | * | Orders of the Board |
| | * | of Immigration Appeals. |
| Eric H. Holder, Jr., United States | * | |
| Attorney General, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: September 23, 2010
Filed: April 14, 2011

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

RILEY, Chief Judge.

Tarique Majeed Shaghil petitions for review of two Board of Immigration Appeals (BIA or Board) decisions. In Case No. 09-3416, Shaghil requests relief from the BIA's affirmance of an immigration judge's (IJ) order denying Shaghil asylum, withholding of removal, and relief under the Convention Against Torture (CAT). In Case No. 10-2483, Shaghil seeks relief from the BIA's denial of his motion to reopen immigration proceedings to enable him to adjust his status, pursuant to 8 U.S.C. § 1255(a), based upon Shaghil's marriage to a United States citizen. We dismiss

Shaghil's petition in Case No. 09-3416 as it relates to his asylum claim, and deny the remainder of both petitions.

## I. BACKGROUND[1]

Shaghil was born and raised as a Suni Moslem in Karachi, Pakistan. In 1991, Shaghil entered the United States to attend the University of South Alabama. In 1995, he married Monica Rodriguez, an American citizen, and filed for adjustment of his immigration status. While married, Shaghil identified himself as a Christian and attended Catholic and Protestant Christian churches. In his testimony, the IJ noted Shaghil "displayed only a marginal knowledge of Christian tenants [sic]" and could not describe his conversion.

In 1998, Shaghil returned to Pakistan for four and a half months. During his visit to Pakistan, Shaghil's friends and family criticized his marriage to Rodriguez because of her Christian faith. He was involved in a fight outside a mosque when he argued with people about his Christian church attendance. Also during the trip, Shaghil's "father told him that he 'needed to change his faith back.'" Shaghil admits, however, "he has never been harmed or arrested or tortured by the government in Pakistan during either the time he grew up there or when he returned later."

After September 11, 2001, Shaghil began making critical comments about Islamic tenets "that he stated supported terrorism." Shaghil believes his business of

---

[1]This factual statement incorporates information from both the merits hearing transcript and the decision and order of the IJ. Shaghil argues the IJ's written opinion, which was reviewed by the BIA, is fundamentally flawed because it relies upon the IJ's review of a hearing transcript which includes several instances of indiscernible testimony. As discussed in Part II.C below, although the transcript is flawed, Shaghil fails to point to any missing evidence or any incorrect fact finding in the IJ's written opinion which prejudiced him. Accordingly, our review includes reference to the IJ's written opinion.

selling prepaid telephone calling cards predominantly to Moslems in the United States suffered because he was "pro-American" and "opposed the terrorists." During this time period, Shaghil and Rodriguez stopped living together and his then-pending application for adjustment of status was denied. Shaghil and Rodriguez divorced in July or August 2006 and Shaghil has not heard from Rodriguez in several years.

Shaghil believes, if returned to Pakistan, "he would be tortured by the police in jail and eventually killed because of his religious faith." As the IJ explained, Dr. Nargis Virani, Assistant Professor of Arabic Islamic Studies at Washington University in St. Louis, testified at Shaghil's hearing that "it would be more likely than not that [Shaghil] would be persecuted if he were returned to Pakistan." The IJ recognized Dr. Virani

> later testified that "perhaps" [Shaghil] would be persecuted. She also stated that it was "possible" that the respondent's family would be targeted because of his conversion. She stated that she believed there had been violence directed against Christians in Pakistan, but noted that recent terrorist acts in that country had not been targeted against Christians, but against civilians of all faiths. She also indicated knowledge that Moslems regularly target each other for acts of harm and violence. She stated a belief that Christians only have low-end jobs in Pakistan, but on cross-examination, stated that she obtained this information from [Shaghil].

The United States Department of State International Religious Freedom Report 2004 (country report) is part of the record. Referring to the country report, the IJ noted the Pakistani constitution provides for freedom of religion, with limits; approximately 96% of Pakistanis are Moslem and less than 2% are Christian; the Roman Catholic Diocese of Karachi estimates 120,000 Catholics live in Karachi; and religion (Moslem or non-Moslem) is indicated on Pakistani passports. The country report notes speaking in opposition to Islam is illegal in Pakistan. Although there is no law instituting the death penalty for apostates (converts from Islam to other religions), "social pressure

against conversion is so powerful that most convergence [sic] reportedly takes place in secret." Notwithstanding, foreign missionaries operate in Pakistan, and proselytizing is generally permitted. The country report notes 90% of Pakistan's Christians live in Punjab Province, and that Christians are the largest religious minority there. The Roman Catholic Church and the Church of Pakistan (Protestants associated with the Anglicans) report that links with co-religionists in other countries are maintained relatively easily. The country report also supports Shaghil's view that "Christians have difficulty finding jobs other than those involving menial labor."

On January 16, 2001, Shaghil received a notice to appear before the immigration court. Shaghil failed to appear at the hearing on May 3, 2001, was found removable and ordered removed. For reasons unrelated to this appeal, the IJ later granted Shaghil's motion to reopen proceedings. Shaghil applied for asylum, withholding of removal, and CAT relief. Before Shaghil's merits hearing, the IJ found Shaghil ineligible for asylum because Shaghil failed to apply within one year of his arrival in the United States and no changed or extraordinary circumstances excused his tardiness.

After the merits hearing, the IJ found Shaghil "generally credible" and Dr. Virani's testimony credible. However, the IJ found the evidence insufficient to show Shaghil would be persecuted because of his religion if he were returned to Pakistan, and denied Shaghil's claim for withholding of removal. Similarly, the IJ was "not convinced that [Shaghil] is more likely than not to be tortured if he were removed to Pakistan at this time." The IJ therefore ordered Shaghil removed from the United States.

On September 21, 2009, the Board dismissed Shaghil's appeal. The Board agreed with the IJ that Shaghil had presented insufficient evidence to excuse the untimely filing of his asylum application, because although Shaghil claims he was persecuted in 1998, he did not file his asylum application until 2003 and made no showing of cause. The Board rejected Shaghil's argument that, upon an earlier

-4-

remand, the IJ erred by improperly listening to audio recordings of Shaghil's merits hearing, rather than allowing him to present additional evidence. The Board confirmed the IJ's finding that Shaghil failed to meet his burden of proving a clear probability of future persecution on his withholding of removal claim. Finally, the Board agreed Shaghil had not shown he would be tortured if returned to Pakistan.

On October 19, 2009, Shaghil petitioned this court for relief from the removal order. On December 16, 2009, while Shaghil's petition for review of the removal order was pending, Lorraine A. Campos, a United States citizen, filed a petition for alien relative with the United States Citizenship and Immigration Services on behalf of Shaghil. On December 18, 2009, Shaghil moved the BIA to reopen his case based upon his asserted marriage to Campos, attaching (1) the petition for alien relative and a notice of its receipt, (2) an application for adjustment of status and related biographic information, and (3) a series of wedding photographs.

The BIA found "no other evidence that [Shaghil] and his wife maintained a relationship at any time" and denied the motion to reopen. On July 2, 2010, Shaghil petitioned this court for review of the BIA's denial of his motion to reopen. On July 19, 2010, this court consolidated Shaghil's petitions for oral argument and submission purposes. We have jurisdiction over final orders of removal pursuant to 8 U.S.C. § 1252(a).

## II.     DISCUSSION
### A.     Standard of Review

This court reviews the BIA's ruling, but to the extent the BIA adopts the finding or reasoning of the IJ, the court also reviews the IJ's decision. See Ismail v. Ashcroft, 396 F.3d 970, 974 (8th Cir. 2005). "[A]dministrative findings of fact are conclusive

unless any reasonable adjudicator would be compelled to conclude to the contrary,"[2] 8 U.S.C. § 1252(b)(4)(B), while conclusions of law are reviewed de novo, "with substantial deference to [the agency's] interpretations of statutes and regulations administered by the agency," Villanueva v. Holder, 615 F.3d 913, 915 (8th Cir. 2010). We review motions to reopen for an abuse of discretion. See INS v. Doherty, 502 U.S. 314, 323 (1992).

### B. Denial of Asylum, Withholding of Removal, and CAT Relief
#### 1. Asylum

"The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established . . . under this section if the Secretary . . . or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). A "refugee" is a person who "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of" his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." § 1101(a)(42)(A).

Shaghil argues he is entitled to asylum because he both suffered past persecution and has a well-founded fear of future persecution. Shaghil concedes this court lacks jurisdiction to review the BIA's decision that his application for asylum is time-barred because he did not file it within one year of his arrival in the United States. See §§ 1158(a)(2)(B) (barring asylum applications of aliens who fail to file within one year of arrival), (3) ("No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)."). Lacking jurisdiction, we dismiss Shaghil's appeal with respect to his asylum claim.

---

[2]This is identical to the substantial evidence standard of review. See Menendez-Donis v. Ashcroft, 360 F.3d 915, 918 (8th Cir. 2004).

### 2. Withholding of Removal

The Attorney General generally must grant withholding of removal if Shaghil proves his "life or freedom would be threatened" in Pakistan on account of his religion or political opinion. See §1231(b)(3)(A). The test is forward looking. However, if Shaghil establishes he suffered past persecution on account of his religion or political opinion, he is entitled to a rebuttable presumption of future persecution. See 8 C.F.R. § 1208.16(b)(1)(i); Beck v. Mukasey, 527 F.3d 737, 739 (8th Cir. 2008). Without a showing of past persecution, it is Shaghil's burden to demonstrate "a clear probability of future persecution" in order to obtain withholding of removal. Beck, 527 F.3d at 739. A clear probability of future persecution is a higher standard than the "well-founded fear of persecution" standard utilized in asylum proceedings. See Ladyha v. Holder, 588 F.3d 574, 579 (8th Cir. 2009). "In the absence of a statutory definition for persecution, we have held that it is an 'extreme concept' that involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of a protected characteristic." Malonga v. Holder, 621 F.3d 757, 764 (8th Cir. 2010) (quoting Sholla v. Gonzales, 492 F.3d 946, 951 (8th Cir. 2007)).

We agree with the Board that Shaghil did not adduce sufficient evidence to show past persecution. The only purported evidence of past persecution Shaghil cites is the 1998 beating incident outside the Karachi mosque. "It is a well-established principle that minor beatings and brief detentions . . . do not amount to political persecution." Eusebio v. Ashcroft, 361 F.3d 1088, 1091 (8th Cir. 2004). In addition, "persecution" is a harm that is "inflicted either by the government of [a country] or by persons or an organization that the government was unable or unwilling to control." Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005) (quoting Valioukevitch v. I.N.S., 251 F.3d 747, 749 (8th Cir. 2001)). Any harm Shaghil suffered was at the hands of five neighbors, not the Pakistani government. And although Pakistani "police at times refuse to prevent such abuses or refuse to charge persons who commit such acts," Shaghil never reported the matter to the police. There is no evidence the government was unable or unwilling to control Shaghil's assailants in this case, and generalized

evidence of occasional police failures, without more, is insufficient to show futility. Cf. Ngengwe v. Mukasey, 543 F.3d 1029, 1035-36 (8th Cir. 2008) (remanding an asylum case where the IJ and BIA failed to address petitioner's evidence that seeking police assistance would be futile, instead citing only the fact petitioner did not contact the police). Substantial evidence supports the IJ's finding that there was no past persecution, and Shaghil is not entitled to any presumption that he will be persecuted in the future.

Shaghil contends "even if he did not suffer past persecution, [he] has done many other things in the U.S. which increase the likelihood that he will be persecuted in Pakistan should he be deported now." Shaghil asserts he would be persecuted if returned to Pakistan because he: (1) "believes women can work outside of the home and remain independent from men," (2) thinks "the fighting between Muslims and Jews in the Middle East is wrong," (3) changed his name from Tarique to Shawn, (4) anticipates the police would fail to help him, (5) "would be unable to work, own a business or get married if he returned," and (6) asserts conditions in Pakistan have worsened since September 11, 2001.

None of these additional facts compel the conclusion that it is more likely than not Shaghil will be persecuted if he returns to Pakistan.[3] Shaghil offers no evidence

---

[3]Nor does the IJ's finding that Dr. Virani was credible compel us to grant the petition. "Persecution" is a legal term of art, and Dr. Virani's opinion regarding whether Shaghil would be subject to persecution is not binding on the Board. In any event, Dr. Virani's testimony is not addressed to the "extreme concept" of persecution that our cases envision:

> Q.   . . . Would he, more likely than not, do you believe, face persecution in Pakistan if he were to return?
>
> A.   *Of some sort*, he would, especially if he's very vocal about his belief.

he would be subject to death, torture, or injury to his person or freedom on account of his new political beliefs. Nor is there evidence his use of an American name makes religious persecution more likely than the bare fact of his Christian faith. Shaghil's remaining assertions evidence nothing more than a subjective and speculative fear of persecution, an unpersuasive showing in the entirely objective withholding of removal analysis.[4] See Malonga, 621 F.3d at 767-68.

Substantial evidence supports the BIA's conclusion that Shaghil failed to meet his burden of proving a clear probability of future persecution. Although Pakistan is undoubtedly a less hospitable place for Christians than the United States, the country report states that although there is social pressure against apostasy, missionaries are present and generally allowed to proselytize. There are also at least two million, and perhaps as many as four million, Christians living in Pakistan without being persecuted. Christians are the largest religious minority in Punjab Province, Pakistan's largest province. See, e.g., Salkeld v. Gonzales, 420 F.3d 804, 809 (8th Cir. 2005) (concluding substantial evidence supported the BIA's denial of withholding of removal where there were some locations within the country where members of the minority could live more safely).

_____

(Emphasis added.) Because the only "sort" of persecution relevant to this case is that defined by immigration law, we find Dr. Virani's statement vague, fundamentally irrelevant, and insufficient to overcome our highly deferential standard of review.

[4]The dissent suggests our holding cannot be reconciled with the IJ's findings that Shaghil and Dr. Virani were credible. See Post at 13 & 15-16. But Dr. Virani never testified Shaghil would be persecuted in the sense our cases require—either by government persecution or because the government would refuse or be unable to protect him. Although Shaghil may subjectively believe the government will torture him if he is removed, no objective evidence supports this assertion.

Because the record supports the BIA's finding that Shaghil failed to meet his burden, we are unable to say any reasonable adjudicator would be compelled to conclude the contrary. Shaghil's petition for withholding of removal is denied.

### 3. CAT Relief

To be eligible for withholding of removal under the CAT, it was Shaghil's burden to prove, by a preponderance of the evidence, he would be tortured if removed to Pakistan. See 8 C.F.R. 208.16(c)(2). Torture is:

> Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in any official capacity.

8 C.F.R. § 208.18(a)(1). Even if Shaghil were subjected to severe pain or suffering in the 1998 beating by neighbors, as discussed above, there is no evidence of any nexus between the pain or suffering and the Pakistani government. Shaghil's petition for CAT relief must be denied.

### C. Due Process

Shaghil argues the BIA violated his Fifth Amendment right to due process of law when it failed to (1) make audio recordings of his merits hearing available to him, and (2) allow him to introduce evidence following an earlier remand. In order "to demonstrate a violation of due process, an alien must demonstrate both a fundamental error and that the error resulted in prejudice." Lopez v. Heinauer, 332 F.3d 507, 512 (8th Cir. 2003). "In this context, prejudice means a showing that the outcome of the proceeding may well have been different had there not been any procedural

irregularities." Tun v. Gonzales, 485 F.3d 1014, 1026 (8th Cir. 2007). As the BIA correctly stated, Shaghil "makes a conclusory statement that the [IJ] did not have an accurate transcript, but fails to specify how it was inaccurate." Shaghil also does not explain how the errors he alleges were in the transcript would have altered the result of his proceeding.

Shaghil's argument that he can show prejudice because of the BIA's withholding of the recordings from him is unavailing. Shaghil was present at his hearings and contends in his brief "that what is missing from the original hearing transcript is vital to his case," yet he does not offer any evidence, or even identify in his brief, what vital information is missing.

As to Shaghil's suggestion that, on remand from the BIA, the IJ should have allowed Shaghil to offer further evidence at a hearing, rather than simply listen to the audio recordings of the first hearing and make corrections to the written order, we find no due process violation. The Board's order "remanded to the [IJ] for further proceedings and for the issuance of a new decision." The order identified two specific errors in the IJ's written opinion and indicated Shaghil was concerned the IJ did not fully comprehend his testimony and allegations of "past harm and fear of future harm." The IJ corrected the errors and "listened to the tapes of the hearing which he had personally conducted, to insure that he did not misunderstand the testimony in reaching his initial decision." And, as the BIA stated in Shaghil's second appeal, Shaghil "does not specify any additional areas where the [IJ] allegedly failed to hear crucial testimony." It was Shaghil's burden to prove fundamental error and prejudice. Because he fails to show either, we reject his due process argument.

### D. Motion to Reopen Proceedings

Lastly, Shaghil suggests the BIA should have granted his motion to reopen.

-11-

[A] properly filed motion to reopen may be granted, in the exercise of discretion, to provide an alien an opportunity to pursue an application for adjustment where the following factors are present: (1) the motion is timely filed; (2) the motion is not numerically barred by the regulations; (3) the motion is not barred by Matter of Shaar, 21 I&N Dec. 541 (BIA 1996), or on any other procedural grounds; (4) the motion presents clear and convincing evidence indicating a strong likelihood that the respondent's marriage is bona fide; and (5) the Service either does not oppose the motion or bases its opposition solely on Matter of Arthur, [20 I&N Dec. 475 (BIA 1992)].

Matter of Velarde-Pacheco, 23 I&N Dec. 253, 256 (BIA 2002). The Board affirmed the IJ's denial of Shaghil's motion because it found Shaghil had not presented clear and convincing evidence the marriage was bona fide within the meaning of the fourth element above. Shaghil argues his motion to reopen should have been granted because the Board's factual finding was wrong. Shaghil suggests the Board overlooked the fact he and Campos lived together "almost a year and a half before their marriage and over one year before the original decision of the BIA in this case." Shaghil also believes the Board erred in stating the photographs of his wedding ceremony were undated and this error betrays a lack of sufficient consideration of the evidence.

The Board did not abuse its discretion in denying Shaghil's motion. The fact Campos had a child with another man while she was living with Shaghil undermines Shaghil's argument that he and Campos's cohabitation proves they had a genuine romantic relationship. Under these circumstances, we cannot say the Board abused its discretion in finding the marriage was not bona fide. And while we agree with Shaghil that the Board erred in referring to his and Campos's wedding photographs as unlabeled and undated, we find the error harmless because the Board's ruling was not based upon its mistaken view regarding the pictures, but rather upon its unfulfilled expectation "that [Shaghil and Campos] would file evidence of the bona fide nature of their relationship at a later date." They did not.

## III.    CONCLUSION

We dismiss Shaghil's petition as it relates to asylum relief in No. 09-3416 and deny petitions Nos. 09-3416 and 10-2483 in all other respects.

MELLOY, Circuit Judge, concurring in part and dissenting in part.

I concur in the opinion of the Court except with respect to whether Shaghil has presented sufficient evidence of future persecution.[5]  In this case, the IJ and the BIA credited Shaghil's evidence of future persecution but found it insufficient to prove a clear probability of persecution under the governing statute.  In my view, a reasonable fact finder cannot make both findings because, if believed, Shaghil's evidence is compelling—he will be severely persecuted if he returns to Pakistan because of his political and religious views.  Accordingly, I would reverse the decision of the BIA.

"The standard for withholding of removal is a clear probability of persecution . . . ." Guled v. Mukasey, 515 F.3d 872, 881 (8th Cir. 2008).  An alien may not be removed if he can show that it is more likely than not that "his life or freedom would be threatened upon removal because of his 'race, religion, nationality, membership in a particular social group, or political opinion.'" Thu v. Holder, 596 F.3d 994, 999 (8th Cir. 2010) (quoting 8 U.S.C. § 1231(b)(3)(A)).  "A threat of future persecution can be established by demonstrating either an individualized risk or a pattern of persecution of similarly situated persons based on one of the five grounds." Id.

---

[5]For the same reasons I believe Shaghil has presented sufficient evidence of persecution, I also believe that he has met his more-rigorous burden of proof under the Convention Against Torture.  I focus my comments only on persecution because "'persecution' for the purposes of withholding of removal may encompass abuse that is less severe than 'torture' for the purposes of the CAT." Malonga v. Mukasey, 546 F.3d 546, 555 (8th Cir. 2008).

"Persecution has been defined by this court as 'the infliction or threat of death, torture, or injury to one's person or freedom, on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Litvinov v. Holder, 605 F.3d 548, 553 (8th Cir. 2010) (quoting Davila-Mejia v. Mukasey, 531 F.3d 624, 628 (8th Cir. 2008)). While this Court reviews an adverse finding on the existence of persecution deferentially, this Court has stated that it will vacate such a finding when "the evidence [is] so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." Osonowo v. Mukasey, 521 F.3d 922, 927 (8th Cir. 2008) (internal quotation marks omitted). In making this determination, this Court *should* conclusively presume that all factual findings made below are accurate "unless any reasonable adjudicator would be compelled to conclude to the contrary." Id. (internal quotation marks omitted).

Here, Shaghil presented substantial evidence in the form of his own testimony, testimony from an expert on Pakistan, and a State Department Report that he would be tortured or killed on account of his religious and political beliefs should he return to Pakistan. Shaghil testified that, based upon his experiences growing up in Karachi, Pakistan and his knowledge of the community, he would likely be tortured or killed for his newfound political and religious beliefs at either the behest of the government or with the government's acquiescence. He testified in part, after describing some of the violence religious minority groups experience at both the hands of the community and the police:

> Q. Okay. Do you believe if you returned to Pakistan that you would be tortured?
> A. 100 percent.
> Q. Okay. Do you believe you would be killed?
> A. Well, of course, they're going to torture me and then maybe I'm not going to survive.

Likewise, his expert, Dr. Verani, testified that, based upon her expert knowledge of the "social and political circumstances" in Pakistan and her interview with Shaghil, Shaghil should fear for his life and well-being if he were to return to Pakistan. She specifically stated: "I think from the area that he comes and the family background that he shared with me, yes, he should have reasonable fear [of persecution]. In addition, with all the other political turmoil that's going on in Pakistan . . . he should have some reasonable fear about his life and his, his well-being there." Later, after opining that it was more likely than not Shaghil would face persecution "of some sort," Dr. Virani further stated:

> Q. –and the definition there [in the Convention Against Torture] would be that it would be more likely than not that he would face torture were he to return to his country. Are you able to form an opinion and to offer an opinion on that regard?
> A. With regard to specific torture or persecution of some sort, depending on whether it is opportunities again, depending on what part of Karachi he lived in, depending on how many people would be there to protect him, I think that, yeah, there would be some level of persecution. It is possible that his family may also be targeted and I think for that reason, if he did choose to stay here or if he has applied to stay here, I think that that would be reasonable, reasonable fear about persecution.

Finally, a State Department Report on Pakistan strongly indicated that Shaghil, as a convert away from Islam, could easily face severe persecution, stating in part:

> While there is no law instituting the death penalty for apostates (those who convert from Islam), social pressure against conversion is so powerful that most conversions reportedly take place in secret. According to missionaries, police and other local officials harass villagers and members of the poorer classes who convert. Reprisals and threats of reprisals against suspected converts are common.

Since the BIA and the IJ credited all of Shaghil's evidence of persecution and since the government failed to present any evidence on this issue, I believe that Shaghil has

carried his burden of proof. Indeed, I cannot discern how a reasonable adjudicator can give credence to Shaghil's evidence and still conclude that he has not shown a clear probability of persecution.

The majority holds to the contrary, discounting both the testimony of Dr. Virani and Shaghil. The majority disregards Dr. Virani's testimony as "vague, fundamentally irrelevant, and insufficient to overcome our highly deferential standard of review" because "persecution" is a term of art for the courts to decide and because Dr. Virani's testimony does not establish the "extreme concept" that is persecution. For support, the majority cites Dr. Virani's statement that Shaghil would face persecution "of some sort" in Pakistan. However, a fair reading of Dr. Virani's entire testimony belies the majority's conclusion. Dr. Virani opined that Shaghil should fear for his life and well-being should he return to Pakistan. Dr. Virani further spoke of torture in a similar manner to persecution, thereby indicating that Dr. Virani's conception of persecution was far more than mere intimidation and low-level harassment, which this Court has found insufficient. Sholla v. Gonzales, 492 F.3d 946, 951 (8th Cir. 2007). As the preceding excerpts indicate, Dr. Virani never equivocated on whether Shaghil would face severe mistreatment if he were to return to Pakistan. At most, Dr. Virani waffled on whether Shaghil's family would also be targeted, stating it was "possible."[6] Thus,

_____

[6]As cited by the majority, the IJ quotes Dr. Virani as testifying that "perhaps" Shaghil would be persecuted. However, a close reading of the transcript reveals that Dr. Virani used the word only once to describe whether Shaghil's outspokenness would further increase the already-existing probability that Shaghil would be persecuted. More specifically, she testified regarding Shaghil:

Q. Okay. And, in fact, even since we've had the last hearing, there has been additional turmoil within the Moslem world over a (indiscernible). Are you familiar with that situation?
A. Yes, I am.
Q. Are you familiar with what he has endured himself in that regard?
A. He hasn't shared with me, but, but he is really vocal about his views, so he may be.

Dr. Virani's testimony, as an unchallenged expert opinion credited by both the IJ and the BIA, should alone present a material hurdle to dismissing Shaghil's petition for withholding.

The majority also discounts Shaghil's testimony. The majority characterizes his testimony as mere assertions, unsupported by evidence in the record and incapable of proving an objective likelihood of persecution. However, Shaghil's testimony is corroborated both by the expert opinion of Dr. Virani and by the State Department's report on Pakistan. Further, Shaghil's testimony regarding his fear of persecution is based upon his own extensive knowledge of and experience in Pakistan, all of which constitutes evidence when, as here, the fact finders fully credit his testimony. See Osonowo, 521 F.3d at 927 ("A credibility determination is a finding of fact, which should be accepted unless any reasonable adjudicator would be compelled to conclude to the contrary." (internal quotation marks omitted)). For example, Shaghil testified that his fear of persecution is based in part on his knowledge of how individuals in similar circumstances were treated, stating:[7]

_____

Q. And would that make things even more extreme to this date?
A. Well, in the present mindedness of the statement, perhaps that would, yeah. . . .

[7]Shaghil also testified on cross examination:

Q. And where in all of this record can you show me that the government of Pakistan seeks out people who have changed their faith? Did you see any documents in any of this? Are you aware of any news stories that the government has persecuted or harmed people who have simply changed their faith?
A. Yes, sir –
Q. Oh.
A. –they do over there.
Q. Okay. What happens?
A. Well, those people, if they're – first of all, they are tortured . . .

Q. Have you read news stories? You've read –

A. Yes, I

Q. Okay.

A. –that's the newspaper (indiscernible).

Q. Okay. And do you know what has happened to those people like you?

A. They, you're going to find the dead body on that street somewhere and it's not going to be –

Q. Has that been in the news?

A. Yes.

While Shaghil did not provide many personal accounts of the persecution of religious and political minorities in Pakistan, his general knowledge of the conditions in Pakistan should not be dismissed out-of-hand when the IJ finds *all* of his testimony credible. Accordingly, to give meaning to the administrative findings of fact in this case, I believe the Court should conclude that Shaghil presented sufficient evidence to prove a clear probability of persecution.

For the foregoing reasons, I concur in part and dissent in part.
_____