# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2351

_____

Jose Maria Rivera; Emperatriz Del Carmen Rivera Delgado; Jose Maria Rivera Delgado; Morena Del Carmen Delgado DeRivera; Reyes Alexander Barahona Delgado

*Petitioner*s

v.

Merrick B. Garland, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: March 13, 2024
Filed: July 5, 2024

_____

Before GRUENDER, SHEPHERD, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jose Maria Rivera ("Rivera"); his wife, Morena Del Carmen Delgado De Rivera ("Morena"); their two children, Emperatriz Del Carmen Rivera Delgado and Jose Maria Rivera; and Morena's son, Reyes Alexander Barahona Delgado ("Reyes") petition for review of the Board of Immigration Appeals ("BIA") order dismissing the appeal of the Immigration Judge's ("IJ") decision denying the family

asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We deny the petition for review in part, grant the petition in part, vacate in part the decision of the BIA, and remand for proceedings consistent with this opinion.

## I.

Rivera was the pastor of a Christian church in El Salvador. He and other local pastors routinely evangelized to gang members, and when they did, other gang members would sometimes tell them to stop preaching or chase them away. Gang members once told Rivera himself to stop preaching. When his church held services, gang members posted themselves outside the building to monitor who attended. He explained that his church, unlike some others in the region, had trouble with gang members because the church tried to "stick close to the word of God" and refused to participate in "illicit" activities.

Through his ministry, Rivera met Ronal Granadeno, a member of the MS-13 gang. They developed a relationship over three years, throughout which Rivera consistently preached the Gospel to Granadeno. The gang did not seem to care until Granadeno decided to join Rivera's church, at which point Granadeno's fellow gang members became upset and ordered Granadeno not to leave town.

Soon after, Granadeno, Rivera, Morena, and Rivera and Morena's daughter were leaving church together when two gang members attacked them. The gang members said that they would kill the men because "no one messes with them" and that Granadeno "belonged to them, not to Christ." The men hit Rivera in the head, held him down, placed a gun to his head, and pulled the trigger. The gun did not fire. They pulled the trigger two more times, but the gun still did not fire. The men then shot and killed Granadeno, who was lying face-down five meters from Rivera. After murdering Granadeno, the men returned to Rivera and kicked him. They also threw Morena against the wall. Later, when Rivera was asked whether the men said anything about his church during the attack, he said they told Morena that they were going to kill her "because we had protected [Granadeno]."

After the men left, Rivera called the police. The police told Rivera that he and his family needed to leave because the gang may return and kill them "for being witnesses and for reporting the homicide." He stayed for a while and even resumed holding worship services until, one day, someone at church warned him that the gang was planning to kill him that day. He and his family fled and ultimately made their way to the United States. After Rivera and his family left El Salvador, gang members began threatening Rivera's stepson, Reyes. They told Reyes that, if he lied to them, they would do the same thing to him that they intended to do to Rivera and the rest of the family. Reyes subsequently fled to the United States as well.

Rivera applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") on behalf of himself and his family, including Reyes. Reyes also separately submitted an application alleging additional grounds for asylum, withholding of removal, and protection under the CAT. After a hearing, the IJ issued a decision, finding both Reyes and Rivera credible. The IJ concluded that Rivera had adequately showed that he suffered past persecution but failed to demonstrate that this persecution was "on account of" his religion or any other protected ground. The IJ reasoned that the gang was angry that Rivera "interfer[ed] with the gang's ranks by convincing [Granadeno] to leave the [gang]" and that Rivera's religion was therefore only "incidental" to his persecution. Thus, the IJ concluded, Rivera and his family were not entitled to asylum or withholding of removal. The IJ also denied CAT relief. Reyes's additional claims were predicated on his assertion that he was a member of a particular social group, Rivera's family, that entitled him to protection. The IJ found that, even if Reyes's membership in Rivera's family satisfied the particular social group requirement, he had not demonstrated the existence of the requisite "animus" against that family. Rivera, Reyes, and their family appealed to the BIA. The BIA dismissed the appeal, concluding that there was no clear error in the IJ's findings that Rivera's religion was not one central reason that the gang targeted him and that Reyes's membership in Rivera's family was not why he was threatened. Rivera and his family now petition for review of the BIA's decision denying their asylum and withholding of removal claims, including review of Reyes's separate asylum claim.

## II.

"We review the denial of an application for asylum, withholding of removal, or CAT relief for substantial evidence . . . , and we review questions of law *de novo*." *Uriostegui-Teran v. Garland*, 72 F.4th 852, 8555 (8th Cir. 2023) (internal citations omitted). "Under the substantial evidence standard, the agency's findings of fact must be upheld unless the alien demonstrates that the evidence he presented not only supports a contrary conclusion but *compels* it." *Id.* "Only the BIA order is subject to our review, including the IJ's findings and reasoning to the extent they were expressly adopted by the BIA." *Id.* Where, as here, "the BIA essentially adopted the IJ's opinion while adding some of its own reasoning, we review both decisions." *Alanwoko v. Mukasey*, 538 F.3d 908, 912 & n.2 (8th Cir. 2008).

Rivera argues that we should grant the petition for three reasons: (1) the BIA decision was issued by an improperly appointed Board member, (2) the record compels the conclusion that religion was at least one central reason for Rivera's persecution, and (3) the agency failed to address the issue of future persecution. Reyes also argues separately that the BIA erred in concluding he was not being persecuted for his membership in a particular social group and that the agency did not analyze his claims carefully enough. We address each of these arguments in turn.

### A.

Rivera first argues that the BIA's decision is void because an "improperly appointed" Department of Justice attorney, John Crossett, issued the decision. Crossett is a BIA employee, and in October 2022, he was appointed by the Attorney General to serve as a "temporary" BIA member. Rivera asserts that Crossett was never properly appointed as a temporary Board member because the version of 8 C.F.R. § 1003.1(a)(4) (2022) in effect at the time provided that "[t]he Director [of the Executive Office for Immigration Review] may in his discretion designate [certain individuals] . . . to act as temporary Board members for terms not to exceed six months." The regulation further provides that, in certain instances, the Director must get the approval of the Deputy Attorney General to make these designations, *see id.*, but it is entirely silent as to the role of the Attorney General himself in the

-4-

designation or appointment of temporary Board members. Rivera interprets this silence to mean that § 1003.1(a)(4) grants the Director the exclusive authority to designate and appoint temporary Board members and that the Attorney General surrendered his own authority to do so when he promulgated this regulation.[1] Thus, Rivera contends, since Crossett was appointed by the Attorney General, he was never properly appointed.

Rivera misreads the regulation. The Attorney General has authority over issues of immigration, and he has the power to delegate that authority to inferior officers. *See* 8 U.S.C. § 1103(g)(2). He made such a delegation to the Director in 8 C.F.R. §1003.1(a)(4) by granting the Director the authority to "designate" temporary Board members. But this does not mean that such Board members cannot be appointed by the Attorney General. Section 1003.1(a)(1) clearly states that Board members are "appointed by" the Attorney General. 8 C.F.R. § 1003.1(a)(1). Temporary Board members are still Board members—the only difference in their responsibilities or power relates to *en banc* matters. *See* 8 C.F.R. § 1003.1(a)(4). Thus, the regulation provides that the Attorney General may make formal Board member appointments, temporary or otherwise. *See Mboba v. Garland*, 2023 WL 4836671 at *8 (5th Cir. Jul. 27, 2023) ("Thus, a contextual reading of the regulations clearly indicates that the Attorney General appoints [temporary Board members].");  89 Fed. Reg. 22630, 22631 (Apr. 2, 2024) (explaining the 2024 amendment, which explicitly authorizes the Attorney General to make appointments, is intended to "more clearly reflect how temporary Board members are appointed" because, though the Director typically selects Board members, they have always been "appointed and reappointed . . . by the Attorney General"). The provision authorizing the Director

---

[1]Section 1003(a)(1) was subsequently amended to address this ambiguity. It now states that the Attorney General may, "[u]pon the recommendation of the Director," exercise "his discretion [to] appoint" temporary board members. 8 C.F.R. § 1003.1(a)(4) (2024).

to designate temporary Board members is not in tension with this conclusion.[2] We conclude that the Attorney General properly appointed Crossett.

Rivera also argues that, even if Crossett was properly appointed in the first instance, his decision was still invalid because, at the time it was issued, he was serving an impermissible second consecutive six-month term as a temporary Board member. Section 1003.1(a)(4) (2022) authorized the appointment of "temporary Board members for terms not to exceed six months." Rivera reads this to mean that such individuals cannot be reappointed. He points out that the regulation governing the appointment of temporary IJs, 8 C.F.R. § 1003.10(e)(1)(i)-(ii), specifically provides for "renewable" terms but the regulation governing the appointment of temporary Board members does not. Although the regulation does not explicitly authorize the renewal of a term or appointment of a temporary Board member to an additional term, it also does not prohibit it. There is no ambiguity in the text of the regulation; it simply does not address the issue of additional terms. Thus, again, we conclude that the regulation "just means what it means." *Kisor v. Wilkie*, 588 U.S. 558, 574-75 (2019). Further, to read the absence of "renewable" to mean that the Attorney General cannot appoint the same individual to multiple terms in the same role would be inconsistent with the Attorney General's broad power to make appointments and delegate his duties to subordinates. *See* 8 U.S.C. § 1103(g); 28 U.S.C. §§ 509-510. The Attorney General exercised that power when he appointed Crossett to two terms, the second of which started the day after the first ended. Nothing in the text of the regulation related to temporary Board members or the

---

[2]This situation is distinguishable from *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266 (1954) where the court determined that, by implementing a regulation directing the BIA to decide cases in their discretion, the Attorney General exclusively and fully delegated his authority to decide such matters to the BIA. The court determined this was the proper reading of the regulation because it was impossible for cases to truly be decided in the BIA's discretion if the Attorney General also retained power to interfere at any time. In contrast, here, there is no conflict or inconsistency created even if both the Attorney General and Director may make temporary Board member appointments.

statutes empowering the Attorney General to make such appointments supports the conclusion that he is somehow limited in doing so when the appointments are consecutive. Thus, the Attorney General can appoint temporary Board members to consecutive terms, and Crossett's reappointment was not barred.

## B.

We turn next to the merits of Rivera's asylum claim. To qualify for asylum, an applicant must show that he is an alien who is "unable or unwilling to return to" his home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). There is no dispute that Rivera satisfies the persecution requirement: the BIA affirmed the IJ's finding that Rivera suffered "serious harm, significant enough to establish persecution if tied to a protected ground." The critical question then becomes whether that serious harm was "on account of" a protected ground.[3] The only "protected ground" raised in Rivera's petition is his religion. Thus, to show that his persecution is "tied to a protected ground," Rivera must demonstrate that his religion "was or will be at least *one central reason* for" his persecution. *Garcia-Moctezuma v. Sessions*, 879 F.3d 863, 867 (8th Cir. 2018). This means that "the protected ground cannot be incidental or tangential to the persecutor's motivation." *Id.* at 868 (internal quotation marks omitted). The IJ and the BIA concluded that religion was not one central reason Rivera was attacked. Rivera claims that the BIA committed legal error in this analysis and that substantial evidence does not support the finding that no nexus existed between Rivera's persecution and his religion. He also argues that it was

---

[3]Rivera also sought withholding of removal. To "qualify for withholding of removal, an applicant has the burden of showing a clear probability that his life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." *Malonga v. Mukasey*, 546 F.3d 546, 551 (8th Cir. 2008) (citation and internal quotation marks omitted); see 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(b). Thus, his withholding of removal claim also turns on this question of nexus.

error for the BIA to not make separate factual findings about his risk of future persecution.

1.

First, we consider the legal analysis of the BIA and the IJ. To establish nexus, a protected ground must be *one* central reason for the persecution, not the *only* central reason. *See Garcia-Moctezuma*, 879 F.3d at 867. An applicant is "not obliged to show conclusively why persecution has occurred or may occur," *Hassan v. Ashcroft*, 388 F.3d 661, 666 (8th Cir. 2004), but instead, he must offer "some evidence" that the persecutors were motivated to harm him "at least in part, on account of a protected ground," *Malonga v. Holder*, 621 F.3d 757, 766 (8th Cir. 2010). If there is a possibility that the persecution at issue involved multiple motivations, not all of which are protected grounds, the agency must then "carefully examine the record to determine whether the evidence shows that the persecution also occurred on account of a protected ground." *De Brenner v. Ashcroft*, 388 F.3d 629, 636 (8th Cir. 2004).

The BIA and IJ both failed to conduct the required careful examination of the record to determine whether religion may have been one of multiple central reasons for the gang members' persecution of Rivera. *See id.* Instead, the IJ summarily concluded that "[t]he evidence . . . shows that the gang attacked him and [Granadeno] because [Granadeno] left the gang." The IJ found that there was no other evidence of persecution apart from that incident and "[t]hus, [Rivera's] religion remain[ed] an incidental factor to the gangsters' motivations." The BIA adopted this conclusion. In other words, both the BIA and the IJ treated the conclusion that one central reason for Rivera's persecution was the gang's anger about Granadeno leaving the gang as proof that Rivera's religion was not one central reason for the persecution. Neither the BIA nor the IJ considered the possibility that Rivera's religion could have been an additional central reason for his persecution. This was error.

The BIA and IJ opinions also signal an impermissibly narrow view of what it means to be persecuted "on account of" religion. As the Fourth Circuit recently recognized in *Chicas-Machado v. Garland*, even if "a refusal to comply with a

-8-

gang's demands may be the immediate trigger for the gang's assault, an asylum applicant has established nexus where . . . a protected ground is the reason the gang issued its demand in the first place." 73 F.4th 261, 268 (4th Cir. 2023) (internal quotation marks omitted). Similarly, even if the ultimate "trigger" for the gang members' attack on Rivera and Granadeno was Granadeno leaving the gang, this does not disapprove the possibility that religion was an underlying central reason for the attack. *See id.* (condemning the agency's analysis for disregarding that it was the applicant's "position in, work for, and attendance at church" that made her a target for forceful recruitment because she would not be suspected of working with them); *cf. Argueta-Hernandez v. Garland*, 87 F.4th 698, 711-12 (5th Cir. 2023) (vacating and remanding for further analysis because the BIA acknowledged that the applicant was targeted because of his position and reputation as a good person but did not consider that he was "considered . . . a good person because he was a well-known religious leader who was 'not doing bad things'").

The BIA's truncated analysis stopped with consideration of whether Rivera's religion was the final "trigger" for his persecution. The BIA emphasized that Rivera was targeted "because he convinced [Granadeno] to leave the gang" but did not look for or grapple with evidence of the causal relationship between Rivera's religion and his work to convince Granadeno to leave the gang. This was error and an "oversimplification" of the nexus analysis that failed to account for the possibility that religion could have been an additional central motive for the gang members' actions. *See De Brenner*, 388 F.3d at 637 (rejecting the BIA's analysis that did not "carefully examin[e] the record for particularized evidence of imputed political opinion"); *see also Argueta-Hernandez*, 87 F.4th at 710 (explaining that "the nexus requirement is not an either-or proposition" and the analysis was not limited to whether the applicant "explicitly said he was not allowed to preach or otherwise exercise his religious rights" (internal quotation marks omitted)).

The BIA and IJ also relied on facts not supported by substantial evidence and failed to consider significant evidence relevant to Rivera's claim that he was persecuted on account of his religion. First, the IJ found that the gang "never prevented [Rivera] from preaching," otherwise "prevented him from practicing his

religion," or "threatened [Rivera] about his religious activities or beliefs." But, during the hearing before the IJ, Rivera was directly asked, "Did [the gang] ever tell you to stop preaching," and he responded, "on one occasion, yes." Although Rivera pointed this out to the BIA, the BIA never addressed it, instead broadly affirming the IJ's factfinding. Second, during Rivera's testimony, counsel asked Rivera: "Did the men mention to you anything about your church before they were beating you or before they shot [Granadeno]?" And Rivera responded: "They told my wife that because we had protected him, they were going to kill her. And that's why—that they were going to kill us." In the IJ's discussion of the facts, the IJ quotes Rivera's response to this question to support the conclusion that Rivera and his wife were going to be killed because *Rivera and his wife* "had protected" Granadeno. But the most logical and natural reading of this sentence is that "we" refers to the church about which Rivera was directly asked. Again, Rivera highlighted this testimony to the BIA, but the BIA did not address it. Third, neither the IJ nor the BIA addressed Rivera's written statement that, during the altercation, the gang members said that Granadeno "belonged to them, not to Christ" before killing him. Nor did the BIA or the IJ grapple with Rivera's testimony that the gang members attempted to shoot him before Granadeno, which undermines the BIA and IJ's conclusion that he was targeted primarily because he witnessed Granadeno's murder.

The BIA also did not address the evidence put forward by Rivera of other Christians being killed or threatened by the same gang for evangelizing, of other gang members being killed for becoming Christians, or of how his church's specific religious beliefs put them at odds with the gang. Rivera identified specific examples of other pastors being killed or harmed while evangelizing and of former gang members being killed for trying to leave gang life to join Christian churches. He testified that he knew that the gang will not leave "religious individuals" alone "after they've tried to help somebody leave the gang," not just once they are successful in doing so. In fact, he testified that he has never seen any other religious individual left alone after trying to help someone leave gang life. He also testified that his church particularly had trouble with gang members because "we are a church that we really try to stick close to the word of God" and therefore he and his church

-10-

members "don't have the liberty to do things that are [illicit] . . . [and] that's what [the gangs] want you to do." Rivera also acknowledged that he knew some churches did coexist with the gangs without issue, even if gang members joined their churches, because they were willing to "collaborate with [the gangs] or cooperate with them [in] . . . whatever illegal activity they want to do." He explained, however, that his religious beliefs did not allow him or his church to do that. The BIA should have considered whether this evidence supported the inference that a second central reason that Rivera was targeted was his religious views and the actions he took in accordance with those views—like helping Rivera leave the gang.

In addition to its legal error, the BIA erred by not considering this evidence. *Cf. De Brenner*, 388 F.3d at 636 (reversing the BIA's no-nexus finding where the BIA gave "no recognition of the undisputed evidence that [persecutors] imputed political opinion to [the asylum seeker]" and concluding that it did not matter that De Brenner was likely targeted in part for her affluence, so long as there was also evidence that her political affiliation was a central reason for the persecution). Accordingly, we vacate the BIA's decision on the issue of nexus. *See Zheng v. Gonzales*, 415 F.3d 955, 960 (8th Cir. 2005) (vacating and remanding for lack of substantial evidence where the IJ and BIA failed to consider significant evidence in the applicant's favor). On remand, the BIA should conduct the proper legal analysis and consider all of the credible evidence relevant to whether Rivera's religion was an additional central reason for his persecution, particularly the undisputed portions of Rivera's testimony. In doing so, it should bear in mind that, even if a protected ground was not the final "trigger" for persecution, persecution may, at least in some circumstances, be "on account of" religion if it is the practice of an individual's religion which leads to him being targeted in the first instance. *See Chicas-Machado*, 73 F.4th at 266.

2.

Rivera also argues that the IJ and BIA erred by not conducting additional fact finding on the issue of future persecution. However, as the Attorney General points out, Rivera presented no evidence that he would be persecuted for religion in the

future, apart from that evidence related to his past-persecution claim. Though "remand is appropriate to allow the BIA to address [issues] in the first instance" when it has failed to address an argument, *Omondi v. Holder*, 674 F.3d 793, 801 (8th Cir. 2012), we do not find the BIA failed to address one here. Because the BIA determined that Rivera put forward no evidence of future persecution apart from what was raised and should have been considered in the context of past persecution, it did not err in finding that the nexus determination was "dispositive" of the entire asylum claim. However, because the IJ and BIA relied on facts not supported by the evidence and committed legal error in its nexus analysis, we note that the BIA may be required to revisit the question of "future persecution" after fully addressing the question of past persecution. *See Bushira v. Gonzales*, 442 F.3d 626, 630 (8th Cir. 2006) (explaining that "proof of past persecution entitles the asylum applicant to a presumption that [he] has a well-founded fear of future persecution").

## C.

Turning to Reyes's separate asylum claim, Reyes argues that the BIA erred by (1) "skipping required factfinding on future persecution" and (2) "making a contradictory finding on nexus." As to "skipping factfinding," Reyes, like Rivera, offered no evidence of future persecution apart from that considered in conjunction with his past-persecution argument; thus, the court did not err by declining to make additional findings on this point. As to nexus, Reyes argued that, in addition to being persecuted for his religion (a claim which rises and falls with Rivera's), he was also a target because of his membership in a particular social group, Rivera's family. The IJ held that Reyes's claim failed because he had not demonstrated that the gang "h[e]ld any animus toward him or the family as a whole." Though Reyes objects to the IJ and BIA's brief analysis on this point, the IJ determined that he had failed to show nexus because the mere fact "that the gangsters questioned him concerning his mother's whereabouts" did not "show[] that the gangsters hold any animus toward him or the family as a whole." The gang members did threaten to harm him but only if he lied about his family's whereabouts—not simply because he was a member of that family. The record does not compel the conclusion that his membership in the family was one central reason that he was threatened. *See Garcia-Moctezuma* 879

F.3d at 868. Thus, we deny the petition for review as to Reyes's separate asylum claim.[4]

## III.

For the foregoing reasons, we deny the petition for review as to Reyes's individual asylum claim, grant the petition for review as to Rivera's claims on behalf of himself and his family, vacate in part the BIA's decision, and remand for further proceedings consistent with this opinion.

—————————————————

[4]We note that, in the event that the BIA finds on remand that Rivera and his family are entitled to asylum or withholding of removal, Reyes would be entitled to such protection alongside the rest of Rivera's family.